Sami LEKA, Petitioner–Appellant,

v.

Leonard A. PORTUONDO, Superintendent, Shawangunk Correctional Facility, Respondent–Appellee.

Docket No. 00–2002.

United States Court of Appeals, Second Circuit.

Argued June 21, 2001.

Decided July 12, 2001.

Michael S. Sommer, McDermott, Will & Emery, New York, NY, (Robert E. Rice and Tomasita L. Harrison on the brief), for petitioner-appellant.

Michael Gore, Assistant District Attorney, Kings County, NY (Charles J. Hynes,

District Attorney, and Leonard Joblove and Victor Barall, Assistant District Attorneys, on the brief), for respondent-appellee.

Before: JACOBS, PARKER, and SOTOMAYOR, Circuit Judges.

JACOBS, Circuit Judge:

Following a 1990 jury trial in the Supreme Court of the State of New York, Kings County, petitioner-appellant Sami Leka was convicted on one count of second degree murder and two counts of criminal possession of a weapon, offenses arising out of the shooting of Rahman Ferati on a Brooklyn street.[1] Leka and the victim were on antagonistic sides of an embittered child custody dispute. The State's case consisted chiefly of the eyewitness testimony of a man and a woman who were passing by on the sidewalk during the shooting. Leka's motion for a writ of habeas corpus, filed in the United States District Court for the Eastern District of New York (Trager, J.), seeks relief on a variety of grounds, including the claim that the prosecution failed to comply with its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose three other eyewitnesses in time sufficient to allow the defense to use their testimony at trial.

We conclude (i) that the eyewitness evidence of Wilfredo Garcia, an off-duty police officer who observed the incident from the second-floor window of his apartment, was favorable to the defense because it would have been inconsistent in important respects with the testimony of the two eyewitnesses at trial; (ii) that the prosecution failed to disclose Garcia's testimony, and for a critical time actively suppressed

it; and (iii) that the potency of such testimony by a (by then former) policeman on behalf of the defense would have been material, particularly in a case in which the jury was initially deadlocked. Accordingly, we reverse the district court's denial of relief and remand for the entry of judgment conditionally granting a writ of habeas corpus and ordering Leka's release unless the State provides him a new trial within 90 days.

## BACKGROUND

Leka and the victim were part of an extended family, linked by blood and marriage, and riven by a custody dispute over the two children of Rahman Ferati's deceased daughter. Ferati, who had in effect kidnapped the children, was killed by the passenger in a car that pulled up to him in the street. The prosecution's theory of the case was that Leka was the gunman, and that the driver was the children's uncle, Zeni Cira. The defense theory was that the gunman was the children's father, Luftim Cira, who testified at trial that he shot Ferati (in self-defense), but whose testimony was evidently not credited by the jury.

The following facts are the only facts that bear upon the decisive aspects of this appeal.

### A. *The Witnesses at Trial*

Elfren Torres and his fiancée, Carolyn Modica, were walking down Ocean Avenue in Brooklyn at about 6 p.m. on February 12, 1988, when Modica noticed a "light-colored" or white car double-parked in front of a psychoanalyst's office, and observed that the passenger (whom she later identified as Leka) was staring at her and

---

1. The weapons offenses evidently arise from the same incident as the murder. The parties, the trial court, and the district court assumed that they stand or fall together, and we make the same assumption.

joking with the driver (amused, she assumed, because her face was bandaged following surgery). Trial transcript ("Tr.") at 377, 379–81. She and Torres walked past the car, and continued "at a slow pace" for approximately "five car lengths" when they heard shooting. The pair dived behind a parked car. Tr. at 463, 383.

Modica took cover throughout the shooting; but Torres, over his fiancée's sensible objection, lifted his head twice to see what was going on. On his first look, he saw an extended arm shooting a gun from the front passenger window of a light-colored car. On his second look, he saw a man—whom he later identified as Leka—standing in the street, shooting downward. When the shooting ended, Torres and Modica emerged from cover; the light-colored car was gone and the victim was bleeding in the street.

B. *The Witnesses Cited in the Brady Claim*

Leka's *Brady* claim cites three other eyewitnesses known to the police. Before discussing the circumstances of disclosure or non-disclosure by the prosecution, it is useful to set out the witnesses' observations, and compare those observations to the trial testimony of Torres and Modica.

*Anthony Chiusano,* the driver of a Command bus on the Ocean Avenue route, noticed a light-colored car stopped beside his bus at a light. When the light changed, he noticed that the car out-accelerated his bus and double-parked, and that gun-fire broke out right after, from the car's rear passenger-side window. Preoccupied as he was with ordering his passengers to duck, and with negotiating his bus around the scene of the gunfire and out of harm's way, he saw nothing else.

*Joseph Gonzalez,* a postman, was at home watching television when he heard gunfire. Gonzalez went to his third-floor window overlooking Ocean Avenue and "saw a man standing across the street falling backwards firing a gun [at a white car]." Jose Gonzalez Aff. of May 24, 1991. He watched the car speed from the scene, around a bus.

Officer *Wilfredo Garcia* of the New York City Police Department was in his second-floor apartment, looking out the window for a friend who was expected momentarily. He heard gunfire, looked in that direction, and saw a light—colored car pull up in front of a man in the street. His account, which is critical to the appeal, is as follows:

I saw muzzle flashes coming from the passenger side of the vehicle. Simultaneously, I observed a [C]ommand bus on the southbound lane go around this vehicle by proceeding in the oncoming (northbound) traffic lane. Since my friend was due at my house momentarily, it flashed through my mind [that] he may be involved.

I immediately ran to my bedroom and retrieved my off-duty weapon. As I was leaving my bedroom, I heard other shots and I looked out of my bedroom window and saw additional muzzle flashes coming from the passenger side of the white vehicle.

I then ran out of my apartment and as I was running down the steps of my building, I heard additional rapid shots. As I got to the main floor of the apartment building, which is one flight down, the shots had stopped. As I exited to the street, the vehicle had already fled the scene. All of this transpired in an amazingly short period of time, which I would estimate to be between 15 and 20 seconds.

I observed the deceased lying face down across the street directly in front of his vehicle. As I approached him, I

noticed a black revolver laying on the street in the immediate vicinity of his body.

Wilfredo Garcia Aff. of Jan. 15, 1991 at 1–2.

## C. *The Accounts Compared*

Leka argues that the accounts of Chiusano, Gonzalez, and Garcia differ in significant ways from the testimony of Torres and Modica.

1. According to Modica, Leka was in a car that was double-parked at the scene long enough for Modica to fixate on him, watch him joshing with the driver, and "slow[ly]" walk with Torres five car lengths before gunfire broke out. According to Chiusano and Garcia, however, the shooting erupted as soon as the shooter's car pulled over from traffic. A jury could deduce from the testimony of Chiusano or Garcia that the man Modica identified as Leka was in one car and that the shooter was in another. Since the only vehicle characteristic cited by everyone is its light hue, that explanation is perfectly plausible, as Modica subsequently conceded in an affidavit solicited by defense counsel in connection with Leka's direct appeal. *See* Carolyn Modica Aff. of Jan. 3, 1991.

2. According to Torres, Leka was the man he saw standing in the street and shooting downward. But neither Chiusano nor Garcia saw anyone get out of the light-colored car. More to the point, the physical evidence and the testimony of Chiusano, Gonzalez, and Garcia strongly support the theory that there was indeed a man standing in the street shooting, but that that man was the victim, Ferati. Garcia recovered a black revolver from the immediate vicinity of Ferati's body. And Ferati's responsive fire would have been aimed "downward," toward the seated shooter in the light-colored car. After trial, Torres was shown a picture of Ferati and conceded that Ferati was the man in the street he saw firing the gun. *See* Elfren Torres Aff. of Apr. 10, 1998 ("Torres Aff.").

## D. *The Disclosures and Non–Disclosures, and the Trial*

Leka was arrested on March 8, 1988 and charged with the murder. During plea negotiations, the prosecution told Leka and his counsel that a police officer had witnessed the shooting and could identify Leka as the shooter. *See* Joseph Benfante Aff. of June 7, 1991 at ¶ 16 (affidavit of Leka's trial counsel). It is conceded that this was false. In any event, no plea agreement was reached, and trial commenced on February 26, 1990.

Twenty-two months before trial, Leka's counsel requested that the prosecution turn over (*inter alia*) all *Brady* material.

In the week before trial, the prosecution turned over to the defense a police report on Chiusano and the grand jury testimony of Gonzalez. The police report, however, mis-spelled Chiusano as "Cansano." And Gonzalez had by then moved to Florida.

At the February 21 *Wade* hearing—three business days before the opening of the trial—the prosecutor identified Wilfredo Garcia (who was by then no longer on the force) as the off-duty police officer who had witnessed the shooting, but did not indicate that Garcia had any information that might be helpful to the defense. *See* Transcript of *Wade* Hearing ("*Wade* Tr.") at 177–79, 197. At the hearing or immediately before, the defense learned that Garcia would not be identifying Leka; nevertheless, the defense dispatched an investigator to interview Garcia.

On February 28, defense counsel advised the trial judge and the prosecution that Garcia was willing to talk with the defense only if he received prior assurance

that that would be acceptable to the prosecution. Tr. at 44–46. The defense asked in open court for the prosecutor's blessing, which the prosecutor recited. On March 2, however, the prosecutor advised the court that Officer Garcia, having had a change of heart, "will speak to the [d]efense on the witness stand." Tr. at 157. According to the prosecutor, Garcia was angered by a deceptive tactic used by Leka's investigator, who (it was reported) had gotten Garcia's telephone number from the superintendent of Garcia's apartment building by claiming to be Garcia's former superior officer, on emergency police business—a ruse that provoked Garcia to make concerned inquiries. *See* Tr. at 156–58. The court granted the prosecution's application for an order barring the defense from making further approaches to Officer Garcia. Then, after seeking and obtaining the prosecutor's assurance that he intended to call Garcia, the trial judge added that "[b]efore [Garcia] is called to the stand, I will give [defense counsel] an opportunity to talk to him." Tr. at 158–59.

The prosecution rested its case on March 16 without calling Garcia. The defense never called him either, and has attributed the lost opportunity to the prosecution and the protective order that the prosecution sought. By its terms, the trial court's order barred the defense from communicating with Garcia except in connection with Garcia's testimony on behalf of the prosecution. On Leka's post-trial § 440.10 motion (seeking vacatur on the ground, *inter alia*, of the newly discovered account of Garcia), the trial judge observed that the defense was not foreclosed from further initiatives after the prosecution rested: "An application[,] after it became clear that Garcia would not testify[,] could have been made. Indeed, the court stated that if the prosecutor did not call Garcia, the rulings previously made would be reconsidered." *People v. Leka*, Indict. No.

2520/1988, at 6 n. 2 (N.Y. Sup.Ct., Kings County, Dec. 6, 1991) (hereinafter, "Section 440.10 Opinion"). The March 2 transcript of the hearing at which the order was issued does not, however, reflect the prospect for reconsideration that the trial judge later seemed to recall, and the State directs us to no other place in the record. *See* Tr. at 159–59.

On March 16, Leka mounted his defense. The district court has summarized this defense as follows:

Neither petitioner nor his co-defendant testified at trial. Instead, petitioner's defense consisted of attacks on Torres and Modica's identifications, buttressed by meteorological evidence which suggested the lighting conditions at the crime scene were poor and by witnesses who testified that petitioner had never worn a mustache [as Torres and Modica described the shooter wore] or at least had not worn a mustache since 1978.

Petitioner also presented an alternate account of the murder, namely that Luftim Cira [the father of the children at issue in the custody dispute] shot Ferati in self-defense while attempting to get his family back from Ferati.... [After the shooting], he threw his gun in the sewer where detectives later recovered it. In support of the self-defense aspect of Luftim's account, various defense witnesses testified that Rahman Ferati was known to be a violent and dangerous man who regularly carried a gun.

The final component of petitioner's trial defense consisted of calling petitioner's friend and two neighbors/in-laws to testify that petitioner was essentially incapacitated by arthritis at the time of the murder. Petitioner also introduced medical records from Coney Island Hospital, which indicated that Leka had vis-

ited its outpatient clinic on February 2nd and February 10th of 1988, complaining of swollen fingers and pain in the back, shoulder, and left knee. The records further showed that Leka had reported a six- to seven-year history of arthritis. Through this evidence, petitioner sought to create the inference that he was physically incapable of committing the murder.

*Leka v. Portuondo,* 76 F.Supp.2d 258, 264–65 (E.D.N.Y.1999) (footnotes omitted).

The defense rested on March 22, and the case went to the jury on March 26. After two days, the jury reported that it was deadlocked. The court directed the jury to continue deliberations. The jury returned its verdict later that day, convicting Leka on all charges.

E. *Post–Trial Initiatives in the State Courts*

On May 18, 1990, Leka filed a motion under N.Y. C.P.L.R. § 330.30 for an order setting aside the verdict. On May 31, the trial court denied his motion without a hearing and sentenced Leka principally to a term of twenty years to life in prison. Leka is now incarcerated.

Leka pursued a direct appeal in the New York Supreme Court, Appellate Division, and also moved in the trial court to have the conviction vacated under N.Y. C.P.L.R. § 440.10, claiming, *inter alia,* that newly discovered evidence—including the observations of Chiusano, Gonzalez, and Garcia—cast doubt on his conviction and that these witnesses' accounts were suppressed by the prosecution.

The trial court rejected Leka's § 440.10 motion in a written opinion. *See Section 440.10 Opinion.* The court did not explic-

itly address Leka's *Brady* claim, but in rejecting Leka's contention that the evidence of Chiusano, Gonzalez, and Garcia was newly discovered, the trial court found that Leka "ma[d]e no showing as to why the evidence contained [in the Chiusano, Gonzalez, and Garcia affidavits] could not have been obtained for use at trial." *Id.* at 5–6.

On February 18, 1992, the Appellate Division consolidated Leka's direct appeal with his appeal from the denial of his motions made under § 330.30 and § 440.10. On November 28, 1994, the Appellate Division affirmed. *See New York v. Leka,* 209 A.D.2d 723, 619 N.Y.S.2d 144 (2d Dep't 1994). The Appellate Division expressly affirmed the ruling that Leka failed to satisfy the requirements for newly discovered evidence. *See id.* at 146 ("The allegations set forth in the moving papers failed to meet the requirements for newly-discovered evidence.") (citations omitted). The Appellate Division did not address Leka's *Brady* claim. *See id.* ("The defendant's remaining contentions, including those raised in his supplemental *pro se* brief, are . . . without merit.").

On March 14, 1995, the New York Court of Appeals denied Leka's petition to appeal. *See New York v. Leka,* 85 N.Y.2d 911, 627 N.Y.S.2d 334, 650 N.E.2d 1336 (1995).

F. *The Habeas Proceeding*

On April 21, 1997, Leka filed pro se a timely petition for a writ of habeas corpus in the Eastern District of New York.[2] Leka subsequently obtained counsel. In his petition, Leka alleged: 1) that the police identification procedures were impermissibly suggestive; 2) that his counsel did not provide effective assistance; and 3)

---

**2.** Leka's conviction became final before the passage of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so

Leka had one year from the date of AEDPA's passage (to April 24, 1997) to file his petition. *See* 28 U.S.C. § 2244(d)(1).

that the prosecution suppressed material evidence in violation of *Brady*. The district court denied Leka's petition. *See Leka v. Portuondo*, 76 F.Supp.2d 258 (E.D.N.Y.1999).

1) Leka's claim that the identification procedures employed by the police were impermissibly suggestive was adjudicated on the merits in state court and rejected. The district court reviewed the state court opinions and concluded that Leka's showing did not overcome the deference owed under AEDPA. In particular, the district court weighed the post-trial recantations by Torres and Modica against their statements to the police, their testimony at the *Wade* hearing and their testimony at trial, and concluded that Leka "[did] not provide clear and convincing evidence rebutting . . . the state trial court's reasonable determination that [the] allegations of coercive or improper police tactics are false." *Id.* at 279.

2) Leka raised two challenges to the effectiveness of his trial counsel: he claimed Zeni Cira's funding of Leka's defense created a conflict of interest; and he claimed (in the alternative to his *Brady* claim) that his counsel was ineffective for failing to investigate Chiusano, Gonzalez, and Garcia and present their testimony at trial.

As to Leka's conflict of interest claim, the district court deferred to the state trial court's finding that "[trial counsel] tried the case most diligently and vehemently." *Id.* at 291. Accordingly, the district court held that Leka had not demonstrated any "lapse in representation" attributable to the alleged conflict. *Id.* at 291–92 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 349, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

As to Leka's "actual" ineffectiveness claim, the district court held that trial counsel's failure to capitalize upon the opportunities provided to investigate the ob-servations made by Chiusano, Gonzalez, and Garcia did not fall outside the "wide range of reasonable professional assistance." *Leka*, 76 F.Supp.2d at 293 (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

3) The district court concluded that the testimony cited by Leka as *Brady* material was not suppressed. The court began by noting that (as discussed above) in response to Leka's § 440.10 motion, the state courts found that Leka made no showing that the testimony of Chiusano, Gonzalez, and Garcia could not have been obtained for use at trial. The district court held that "[t]he state courts' determination on this question of fact was reasonable in light of the evidence before them and thus binding on habeas review." *Leka*, 76 F.Supp.2d at 283.

The district court based that holding on its finding that there was sufficient time between the disclosure of Chiusano, Gonzalez, and Garcia as witnesses (February 19, 22, and 21 respectively) and opening arguments (March 2) to afford the defense an opportunity to use their testimony at trial. *See Leka*, 76 F.Supp.2d at 282–86. Although Chiusano's name was mis-spelled in the prosecution's disclosure, the district court found that the defense (after finding no "Cansano") could have tracked down Chiusano through the bus company, which would know which driver was on the particular route at that particular time (if the bus was on schedule). *See id.* at 283. Although Gonzalez had moved to Florida, the district court found that (as of four days before opening arguments, i.e., on the first day of trial) the defense knew the Florida town in which he lived, and that, notwithstanding that opportunity, the defense indicated later at trial it would not seek Gonzalez's testimony. *See id.*

As to Garcia, the district court noted the state trial court's finding that "Garcia was known" to the defense. *Id.* at 282 (quoting *Section 440.10 Opinion,* at 6 n. 2). The finding that "Garcia was known" to the defense is true enough as far as it goes. But the record support for this finding is the prosecution's disclosure of Garcia's identity at the *Wade* hearing on Wednesday, February 21, three business days before trial. After a searching review of the record, the district court (i) credited the prosecution's account of the defense's botched effort to contact Garcia; (ii) accepted the trial court's post-trial finding that defense counsel was aware "that if the prosecutor did not call Garcia," the protective order "would be reconsidered", *Section 440.10 Opinion,* at 6 n. 2; and (iii) found it "difficult to accept" Leka's contention that Garcia was originally "a willing defense witness" discouraged from cooperating by the prosecution, *Leka,* 76 F.Supp.2d at 284, 285 n. 41. Having made or deferred to these findings, the district court (i) treated the protective order as a reasonable measure for the prosecution to seek; (ii) pointed out that defense counsel sought no reconsideration of the protective order after the close of the prosecution's case; and (iii) treated that fact as an election on the part of the defense.

The district court also held that the testimony of Chiusano, Gonzalez, and Garcia was not material. The court found that Leka "had more than ample ammunition with which to impeach Modica and Torres' testimony." *Id.* at 288. Although Garcia's testimony might have reinforced the defense argument that the man Torres saw shooting in the street (and identified as Leka) was instead the victim, the court noted that the jury might have credited that defense argument but have concluded nonetheless that Leka shot Ferati while remaining in the car. The district court undertook a detailed analysis—correlating the estimated speed of the bus, the walking pace of Torres and Modica, and length of the block—and concluded that "[i]t is possible ... to construct a sequence of events that would be consistent with all the salient features of *both* Modica's testimony and Chiusano's statement to the police." *Id.* at 289 n. 49 (emphasis in original). Finally, the district court noted that the observations of Chiusano, Gonzalez, and Garcia would have undermined the alternate theory of the crime offered by Leka at trial (that Ferati was shot by Luftim Cira, the father of the children in the custody dispute, or by his brother Zeni Cira), because the testimony supporting that scenario suggests that the car stopped for some seconds before the shooting began.

We reverse solely on the basis of Leka's *Brady* claim, and only with respect to the non-disclosure of information concerning Officer Garcia. We hold that this evidence was favorable to the defense, that the prosecution suppressed it, and that it was material. Our evaluation of materiality considers the weight of the evidence at trial, the vulnerability of the eyewitness trial testimony, the recantations made by those eyewitnesses, and the accounts of Chiusano and Gonzalez; those observations do not and are not intended to imply that the district court's rulings were erroneous in any other respect.

## DISCUSSION

### I

The state courts rejected but never explicitly addressed Leka's *Brady* claim. We need not decide what level of deference to accord those rulings, because even under AEDPA's deferential standard of review, the rejection of Leka's claim as to Garcia's testimony was unreasonable. *See* 28 U.S.C. § 2254(d); *see generally Wash-*

ington v. Schriver, 255 F.3d 45 (2d Cir. 2001) (discussing debate as to whether state court opinion that is silent as to merits of federal claim constitutes "adjudicat[ion] on the merits" under AEDPA). The trial court found that Leka "ma[d]e no showing as to why the evidence contained [in the Chiusano, Gonzalez, and Garcia affidavits] could not have been obtained for use at trial." *Section 440.10 Opinion* at 5–6. As the district court noted, a determination of fact made by a state court is presumed correct. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."). And we agree with the district court that Leka bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

■ We review the district court's denial of habeas relief *de novo*. *See Smalls v. Batista*, 191 F.3d 272, 277 (2d Cir.1999).

## II

■ The *Brady* obligation is as follows:

To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation [grounded in the 14th Amendment] to disclose that evidence to the defendant. Information coming within the scope of this principle ... includes not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir.1998); *see also Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule is in derogation of the ordinary allocation of responsibilities under the adversary system, but does not displace it; rather, it implements the prosecution's "special role" in the search for truth in criminal trials. *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *see also United States v. Bagley*, 473 U.S. 667, 675 n. 6, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

In *Strickler*, the Supreme Court ruled that:

There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler*, 527 U.S. at 281–82, 119 S.Ct. 1936; *see also Boyette v. Lefevre*, 246 F.3d 76, 89 (2d Cir.2001).

Different issues of suppression and materiality are presented by each of the three witnesses cited by Leka, and we base our ruling solely on the State's breach of its *Brady* obligation as to Garcia. That claim is sufficient by itself because in plea negotiations, the prosecution singled out Garcia as a key witness (without, however, giving his name); Garcia's observations tended to undermine the testimony of both eyewitnesses sponsored by the prosecution; as a police officer, Garcia was a trained observer whose testimony we think would likely have been credited; after the prosecution identified Garcia, it took successful steps to prevent the defense from interviewing him; and the prosecution never disclosed at any time to the defense the true nature of Garcia's testimony. The *Brady* claim as to Chiusano and Gonzalez is not so clear-

cut. And since Leka's claim as to Garcia is sufficient alone to warrant relief, we decline to rule on any other or additional basis.

## A. *Favorable Evidence*

■ Leka's *Brady* argument cites eyewitness testimony in a murder case in which there was no evidence of Leka's guilt other than eyewitness identification. The evidence at issue was therefore of a kind that would suggest to any prosecutor that the defense would want to know about it. More particularly, Garcia's testimony casts doubt on the testimony of both eyewitnesses presented by the prosecution at trial. If, as Garcia observed, the shooting started as the light-colored car pulled over, it is very unlikely that the shooter was the man that Modica identified as Leka, who (according to Modica) had been joking idly in the minutes before the shooting erupted; and if the victim was returning fire, it is very unlikely that the man outside the car shooting downward was Leka, as identified by Torres, and very likely that he was the victim. Garcia's observations were favorable to the defense.

## B. *Failure To Disclose*

■ Leka demanded *Brady* material twenty-two months before trial. Although the prosecution indicated early on in this case that a police officer had witnessed the shooting and could identify Leka, the prosecution did not identify Garcia by name until three business days before trial. And it is evident from the transcript of the

*Wade* hearing (at which that disclosure was made) that the defense was then told that Garcia would not identify Leka, but was told nothing about what Garcia saw.[3] *See Wade* Tr. at 197.

A week after the first identification of Officer Garcia at the *Wade* hearing, the prosecution told the trial court that an investigator for the defense employed deceit in order to gain access to the witness, an allegation that the trial court and the district court credited and that, for the purposes of this appeal, we accept as true. The relief sought by the prosecution—and granted by the trial court—was broader, however, than anything needed to protect Garcia; it foreclosed access to Garcia in the small window between the date the prosecution first disclosed his identity and the date that the defense mounted its case. Even if it were thought that this former police officer was so vulnerable, naive, and impressionable that a court order was needed to protect him from a lawyer or an investigator, that purpose could have been accomplished by an order forbidding misrepresentation, or by an order setting ground rules for an interview. It is on the whole more likely that the prosecution sought the order to protect its case from investigation than to protect Garcia from imposition.

In *United States v. Payne*, 63 F.3d 1200 (2d Cir.1995), this Court stated the principles that decide this appeal:

> Under *Brady* and its progeny, the government has an affirmative duty to dis-

---

**3.** According to Leka's counsel, the government suggested at the outset that Garcia had identified Leka from a lineup. On February 20, 1990, the first day of the *Wade* hearing, the prosecution stated that Garcia had never actually been asked to make a photo or corporal identification of Leka, but that the prosecution would bring Garcia into court the next day, presumably to make such an identification. *See Wade* Tr. at 108–09. The next day,

however, the prosecution decided, without an explanation on the record to the court, that it was not going to call Garcia to make an identification. The record captures the amazed reaction of Leka's counsel: "[t]he main witness we thought was going to come into this courtroom in this case now doesn't want to make an ID, the off-duty police officer. He claims he didn't see anything." *Id.* at 197.

close favorable evidence known to it, even if no specific disclosure request is made by the defense. The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation. Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant.

*Id.* at 1208 (citations omitted); *see also Spicer v. Roxbury Correctional Inst.,* 194 F.3d 547, 558 (4th Cir.1999) ("[W]hen the prosecutor receives information that he, as an objectively reasonable prosecutor, should recognize as exculpatory or of impeachment value, he is under a duty to disclose it to the defendant if it is material."). In this case, of course, the prosecutor never made specific disclosure of what Garcia had seen. There is no doubt that the prosecutor had that information from the beginning of the case: Garcia was a police officer who witnessed a murder. And it is clear that the information was favorable to the defense. So there is really no question but that the government suppressed information that it was required to turn over.

The government argues that its disclosure on the eve of trial (consisting of Garcia's name and presumably his address) was sufficient to permit the defense to learn all that it needed to know. We address that contention and determine that the disclosure was too little, too late.

■ "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982) (citations omit-

ted). But it is not contended that the defense would have identified Garcia by basic investigatory steps prior to its pretrial preparation; and once trial comes, the prosecution may not assume that the defense is still in the investigatory mode.

■ It is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated. *See United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir.1974); *Grant v. Alldredge,* 498 F.2d 376, 382 (2d Cir.1974). Indeed, *Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward. *See Imbler v. Pachtman,* 424 U.S. 409, 427 n. 25, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (noting that the duty to make *Brady* disclosures at trial "is enforced by the requirements of due process").

The district court considered it sufficient that Garcia was identified to the defense "*nine* days before opening arguments and *twenty-three* days before the defense began its case." [4] *Leka,* 76 F.Supp.2d at 284 (emphasis in original). These are relevant considerations. At the same time, however, the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use. One good example is the last-minute identification of Chiusano, whose mis-spelled name was a useless datum without a preliminary investigation aimed at the bus company; another good example is the last-minute

---

4. Throughout its opinion, the district court cites as the useful dates (i) March 2 (opening statements) rather than February 26 (jury se-

lection and pre-trial motions) and (ii) the beginning of the defense.

identification of Gonzalez, who had moved away.

As to Garcia, the defense evidently had sufficient time to attempt an interview, but we assume that it bungled the contact by a deceptive and aggressive maneuver, and as a result was barred from further contact. It is easy, however, to see this as a blunder precipitated by the prosecution's failure to discharge its duty under *Brady*. In any event, the prosecution is in no position to fault the defense for cutting corners when the prosecution itself created the hasty and disorderly conditions under which the defense was forced to conduct its essential business. All of these circumstances demonstrate how the delayed disclosure of evidence tends to impair the opportunity of the defense to use it:

> [I]t was imperative that upon request prior to trial the complete details of the [suppressed evidence] be disclosed. Although it well may be that marginal *Brady* material need not always be disclosed upon request prior to trial, the fact that [a witness identified a man other than the accused as committing the crime] was without question specific, concrete evidence of a nature requiring pretrial disclosure to allow for full exploration and exploitation by the defense. This information, so withheld by the Government, would have had a material bearing on defense preparation, and therefore should have been revealed well before the commencement of the trial.

*Grant*, 498 F.2d at 382 (internal citations and quotation marks omitted).

The limited *Brady* material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case. *See United States v. Cobb*, 271 F.Supp. 159, 163 (S.D.N.Y.1967) (Mansfield, J.) ("[T]here may be instances where disclosure of exculpatory evidence for the first time during trial would be too late to enable the defendant to use it effectively in his own defense, particularly if it were to open the door to witnesses or documents requiring time to be marshalled and presented.").

Moreover, new witnesses or developments tend to throw existing strategies and preparation into disarray. For example, Leka undertook to show on defense that weather conditions might have impaired visibility—a tack he may not have wanted to take if he was going to rely on what Garcia saw from his second-floor window across the street. And in rejecting Leka's arguments on materiality, the district court carefully demonstrated that Garcia's testimony (that the gunfire started as the car pulled over) is in possible tension with the testimony of defense witness Luftim Cira (who testified that he shot Ferati in self-defense), who estimated that his "car must have been stopped not more than 30 seconds." Tr. at 1439. By the same token, however, this testimony illustrates how difficult it can be to assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices then available.

For the same reasons, a disclosure made on the eve of trial (or after trial has begun) may be insufficient unless it is fuller and more thorough than may have been required if the disclosure had been made at an earlier stage. Here, it is ridiculous to think that the prosecution did not know what a police officer saw as a witness to a shooting; yet the last-minute disclosure

consisted of nothing but Garcia's name and perhaps his address. The only other information available to the defense was the (false) statement during plea negotiations that a police officer could identify Leka and the (true) statement at the *Wade* hearing that he could not.[5]

At that stage of proceedings, we think that such a disclosure afforded insufficient opportunity to use the information. As we stated in *Grant*:

> We refuse ... to infer from the failure of defense counsel, when surprised at trial, to seek time to gather other information on [the suppressed witness], that defense counsel would have by-passed the opportunity had the prosecutor apprised him of the [evidence] at a time when the defense was in a reasonable pre-trial position to evaluate carefully all the implications of that information. Given the time for preparation which counsel was denied by the belated disclosure, it seems to us counsel might have pursued a course of inquiry which would have resulted in ferreting out ... relevant ... information.

*Grant*, 498 F.2d at 382 (internal citations and quotation marks omitted); *see also Blake v. Kemp*, 758 F.2d 523, 532 n. 10 (11th Cir.1985) ("In some instances [disclosure of *Brady* material during trial] may be sufficient. However ... some [*Brady*] material must be disclosed earlier. This is because of the importance of some information to adequate trial preparation." (citing *Grant*, *inter alia*)); *United States v. Polisi*, 416 F.2d 573, 578 (2d Cir.1969) ("Under *Brady v. Maryland*, we must look to the prejudice to the accused of the suppression, in its effect upon his preparation for trial.").

The trial court and the district court emphasized that the defense had an opportunity, after the prosecution rested, to seek a dispensation from the protective order. In the first place, it is the prosecutor's burden to make full disclosure of exculpatory material, not the defendant's. Here, of course, the disclosure was never made. In any event, the opportunity was insufficient for several reasons. Disclosure first made during the defendant's case is often of lesser utility. And the prosecution pressed its advantages to extend the delay, first by procuring an order that would have exposed the defense to contempt if the defense attempted to interview Garcia during the prosecution's case, and second by representing to the trial court (on March 1, and again on March 2) that the prosecution intended to call Garcia as a trial witness, a dubious representation in light of what Garcia had to say. Moreover, the assertion that the protective order contemplated reconsideration (if the prosecution did not call Garcia to testify) is erroneous. The transcript of the relevant colloquy and order shows nothing of the kind, *see* Tr. at 158–59; and the State directs our attention to nothing on this point elsewhere in the record.

Even so, there is no doubt that when the prosecution rested without calling Garcia, the defense could have sought a modification (or clarification) of the court order prohibiting contact with him. But to act then, the defense would have had to seek leave of court, and if leave was granted, commit its trial resources for a cold interview with someone who might know noth-

---

**5.** Remarkably, according to Leka's counsel:
 [N]ot one DD5 complaint follow-up report, nor a simple shred of documentation, either grand jury testimony, *Consolazio* material, or notes or memoranda of any kind evidencing [Garcia's] eyewitness account was ever produced or allegedly generated by any member of law enforcement or the District Attorney's office.
Joseph Benfante Aff. of June 7, 1991 at ¶ 18.

ing useful. And at that point, the opportunity to seek out a new witness would have been of limited usefulness unless the prosecution was prepared to disclose what it knew about Garcia's observations, or to facilitate an interview. That was never done.

The opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought. A responsible lawyer could not put Garcia on the stand without essential groundwork. And a responsible lawyer in the midst of the pressures and paranoias of trial may well deploy scarce trial resources doing other things. At that point, without substantive disclosure by the prosecution, the supposed failure by the defense to petition for leave to seek out Garcia cannot fairly be seen as a default or a neglect, or even as an election. Even if the defense was at last afforded a chance after the close of the prosecution case to make an application to try to contact Garcia, the options left open to the defense were to expend and perhaps waste scarce trial resources on a possible dry hole, or to call a witness cold, which would be suicidal. These are not opportunities for use.

It is not enough for the prosecution to avoid active suppression of favorable evidence; *Brady* and its progeny require disclosure. We can assume that the prosecutor knew the content of Garcia's exculpatory testimony. But we need not decide whether the non-disclosure was a deliberate tactical concealment, or resulted from the mismanagement of information, or from sloppy thinking about the

evidentiary significance of the material. And we need not decide whether the prosecution appreciated the significance of Garcia's testimony from the beginning, or came to appreciate its significance later at the *Wade* hearing, or even later, in the midst of trial. It is clear enough, without deciding these questions, that the prosecution failed to make sufficient disclosure in sufficient time to afford the defense an opportunity for use.

We conclude therefore that Garcia's testimony was "suppressed" by the prosecution, *see Brady*, 373 U.S. at 87–88, 83 S.Ct. 1194, and to the extent that state court factual findings can be read to the contrary, Leka has succeeded in rebutting those findings' presumed correctness with "clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *see also Ventura v. Meachum*, 957 F.2d 1048, 1054 (2d Cir. 1992). Because we hold that Garcia's suppressed testimony was material (see below), we need not address Leka's claim that the testimony of Chiusano and Gonzalez was suppressed.

### C. *Materiality*

 The district court ruled that information about Chiusano, Gonzalez, and Garcia was not material because it was either cumulative of testimony already offered at trial, or because it would have weakened the defense by calling into doubt testimony on which the defense relied.[6] The Supreme Court has formulated the standard of materiality for these purposes as follows:

---

**6.** The district court cites the defense testimony of Luftim Cira, the children's father, who testified that he killed Ferati (in self-defense), but whose account included the detail that his car may have lingered before the shooting for "not more than thirty seconds or so," Tr. at 1439, a detail that is in tension with Garcia's

observation that the shooting started as the car pulled over. There is nothing in this that ordinary trial preparation could not have cured if the defense had had an opportunity to prepare its case with Garcia's account in mind.

[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).... [The] touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal citations and quotation marks omitted); *see also United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir.1995). The materiality test is "not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434–35, 115 S.Ct. 1555.

Materiality is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted. *See Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547, 561 (4th Cir.1999) ("Withheld, favorable evidence ... in a context where the undisclosed material could have been used to render the evidence of guilt ambiguous has a more significant impact than where the evidence of guilt is otherwise ample." (internal citation and quotation marks omitted)); *United States v. Orena*, 145 F.3d 551, 559 (2d Cir.1998) (holding that "the strength of the independent evidence of appellees' guilt increases the degree of significance that would need to be ascribed to the withheld impeachment evidence in order for it reasonably to undermine confidence in the verdict"). We therefore examine the strength of the evidence against Leka.

### 1. *The Eyewitness Identifications*

██ The sole evidence at trial connecting Leka to the shooting was the eyewitness testimony of Torres and Modica. The jury charge, set out in the margin, says as much.[7] Unable to cite corroborating evidence, the State emphasizes the reliability of the identifications made by Torres and Modica. We are wholly unconvinced.

The State highlights the fact that Torres and Modica each identified Leka as the shooter in three separate identification procedures: a photo-array immediately after the shooting; a line-up several weeks later; and a line-up organized by the defense just prior to trial, which was com-

---

7. The trial court charged the jury:

As you are now aware the only evidence which in any way establishes or tends to establish that the defendant, Leka, is the actual perpetrator, is one of the actual perpetrators; that is, the right man, is the testimony of the eye witnesses, Modica and Torres. Aside from their testimony that the defendant is the right man, there is no other evidence whatsoever which identifies Leka as the perpetrator. In such case the law requires that the jury must be satisfied that the identification testimony by Modica and Torres is as certain as any human recollection permits under the most favorable circumstances.

Tr. at 1896.

posed of persons of Leka's Albanian ancestry.

As defense counsel argued at trial, the photo array viewed by Torres and Modica (and examined by this Court) included six photographs, of which four or five show people with Latin facial structures and facial hair in fashion among Hispanic men. Leka's Balkan features and moustache stand out. Torres stated in an affidavit prepared for Leka's habeas petition:

> The photo-spread [I viewed following the shooting] contained six photographs, five of which I immediately recognized as being of Hispanic men. The final photograph was of a lighter skinned, foreign looking individual. It was that photograph that I focused on because I knew that the man I had seen was not Hispanic.

Torres Aff. at 1–2.

This narrowing of the field evidently induced Modica as well to identify Leka's photo; she had initially hesitated because the shooter was "15 pounds heavier." Tr. at 509. No wonder, when she picked Leka's photo, she remarked, "Gee, he looks skinny." Tr. at 511.

Torres' affidavit goes on to say that he was pressured by the police into identifying Leka's photograph:

> I told the police that the [photo of the] foreign looking guy looked something like the man I had seen. At that point, several of the police officers who were surrounding me immediately began to tell me not to "bullshit" them. They said that they knew "he was the guy," and that "I knew he was the guy," and that I should "cut the crap, do the right thing, be a stand-up guy, and make a positive identification." At this point, I had been at the precinct for over four hours. It was the middle of the night, and since our arrival at the police station I had not seen [Ms. Modica] who I knew

was feeling ill. I was surrounded by police officers who were pressuring me into making an identification, and they were repeatedly reassuring me that they knew the foreign looking guy in the photo-spread was the shooter. I believed the police when they told me he was the right guy, and wanting both to go home and to help the police, I selected the photograph of the man I now know as Sami Leka.

Torres Aff. at 2. Torres added that, "[b]ased on my discussions with [Modica], I understand that her experience at the police station was similar to mine." *Id.*

When, later on, Torres viewed the lineup, his identification of Leka was influenced by the photo array:

> I immediately recognized Sami Leka from having studied his photograph [earlier]. It struck me that Leka's build and height appeared so different from the man I had seen on Ocean Avenue. Nevertheless, as a result of the photo-spread of just a few weeks before, it was easy for me to identify Sami Leka.

*Id.*

Modica's remarks at the first line-up do not reflect confidence: "I am choosing between two of them"; "[I am] looking at one guy's build and then looking at [another] guy's face"; and "Wow, I thought his body was bigger than it was." Tr. at 516.

As to the second line-up, according to Torres, "[b]y this time, it was simple to pick out Leka." Torres Aff. at 2.

As one can surmise from these excerpts from Torres' affidavit (submitted after the trial concluded), he has recanted his identification:

> At some point after the trial, I saw a photograph of the victim—Rahman Ferati—for the first time. When I saw his face, it became clear to me that the

person I had seen standing outside the car shooting a gun was Ferati and not Leka. I believe that the only reason I ever selected the photograph of Sami Leka was because his was the only non-Hispanic face in the photo-spread, and the police both intimidated me and convinced me that they knew he was the shooter, and that I had a duty to pick him out.... Having since seen the photograph of Ferati, I believe that my various identifications of Sami Leka were wrong.

*Id.* at 3. Modica has partially recanted her identification:

After speaking with [Leka's attorney], I feel it is fair to state that it is a realistic possibility that a mistake had been made in identifying Sami Leka in the murder case of Mr. Ferati. [Leka's attorney] explained to me that the car I saw (in which I had identified Mr. Leka as a passenger) had already pulled out and that the car the murderer was in was seen pulling up double parked and shooting by a bus driver. This makes me feel that it is possible that it was a different light/white car I saw with a passenger who looked like Sami Leka by coincidence. That there is a realistic possibility that as we walked by, the car I saw pulled away, and another similar car pulled in.... [A]fter obtaining ... information [from Leka's attorneys] and after my discussion about the events on the day in question, I cannot honestly say I am positive that Mr. Leka was the man in the car I passed—it[']s possible to have been someone who had his style hair ... and coloring with brown eyes.

Carolyn Modica Aff. of Jan. 3, 1991 at 1–2.

Finally, there was another eyewitness. As Ferati lay in the street, one of his relatives heard his dying declaration. The relative testified at trial that he asked Ferati if he saw who shot him and if he knew the killer, and that Ferati's dying declaration was "Zeni, Zeni, Zeni." Tr. at 191–92. The State argues that when Ferati said "Zeni, etc.," he was making wheeling motions with his hands, which suggested to the prosecutor that Ferati was trying to identify the driver rather than the shooter. But Ferati also said that he did not recognize "the others." Tr. at 192. Since the motive advanced by the prosecution was Leka's involvement in a family feud over Ferati's grandchildren, and since Leka was known to the Ferati family "since [Leka] was born," Tr. at 256, Ferati's inability to recognize "the others" would seem to exclude Leka.

### 2. *The Impact of Garcia's Testimony*

It is likely that Garcia's testimony at trial would have had seismic impact, both because of what he would have said and because his testimony would have furnished the defense with promising lines of inquiry for the cross-examination of Torres and Modica. Evidently, the evidence from Garcia and the others has now convinced even Torres and Modica to doubt their identification of Leka. As the jury would appreciate: Garcia, a former police officer, is a trained and impartial observer; he happened to be at a vantage that commanded the scene of the crime; and he had reason to be on the lookout (for a visitor). He saw the entire incident except for brief seconds when he retrieved his revolver (from a room with another window overlooking the shooting) and when he ran down the stairs to be at the scene.

What Garcia saw renders Torres' observations untenable. Torres saw one person outside the car shooting, and identified him as Leka. According to Garcia, however, the victim went down with a gun, and it is not disputed by the State that the victim returned the fire of his killer. Since no witness observed the shooter

(Leka or anyone else) leave the car, and since the victim (who was standing) would be shooting downward toward the shooter seated in the light-colored car, Garcia's testimony would support the conclusion that the person Torres identified as Leka was the victim. As the district court noted, this conclusion is reinforced by the fact that "Torres told police detectives that the man he had seen [shooting] was holding a black revolver with a brown handle. In fact, Ferati's gun was a black .44 caliber revolver with a brown handle, whereas the actual murder weapon was a black, nine millimeter semi-automatic." *Leka v. Portuondo*, 76 F.Supp.2d at 287 (citations omitted). Furthermore, Torres testified that he estimated that the shooter was "about five nine" with a "medium build." Tr. at 587, 656, 678–79. Leka is 5'3", 115 pounds, and Ferati was 5'9", 165 pounds—the difference between a bantamweight and a light heavyweight (or cruiserweight). *See Leka*, 76 F.Supp.2d at 287; *see also* Tr. at 905, 1295. The most plausible conclusion that can be drawn from Garcia's testimony, taken together with Torres's testimony, is that (as Torres has since conceded under oath): "the person [Torres saw] standing outside the car shooting a gun was Ferati and not Leka." Torres Aff. at 3.

Garcia's testimony would have likewise cast doubt on Modica's identification. Modica recounted her observation of a man lounging and joking in a double-parked car that remained stationary while she walked five car lengths past. That man cannot be the shooter if, as Garcia saw, the shooting began just as the light-colored car pulled up. (Although we do not rely upon the non-disclosure of Chiusano to the defense, it is worth noting that Chiusano would have confirmed that the shooting started right after the light-colored car pulled out of the traffic.)

### 3. *The Hung Jury*

After two days of deliberation, the jury reported that it was hung. In light of the substance of Garcia's testimony, the credibility of a former police officer appearing as a defense witness, and the fact that the jury was at one point hung, it is easy to conclude that "the government's evidentiary suppression undermines confidence in the outcome of [this] trial." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (internal quotation marks omitted). The state courts' failure to reach this conclusion represents "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

\* \* \* \* \* \*

Because we grant habeas relief on the ground that the prosecution suppressed material evidence favorable to the defense, we decline to address Leka's remaining claims.

### CONCLUSION

We reverse the decision of the district court and remand for the entry of judgment conditionally granting the writ and ordering Sami Leka's release unless the State provides him with a new trial within 90 days. The mandate will issue forthwith.