13-2314(L)
United States v. Dupree, Watts

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 28th day of July, two thousand fifteen.

PRESENT: JON O. NEWMAN,
         DENNIS JACOBS,
         REENA RAGGI,
              <u>Circuit Judges</u>.

- - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,
              <u>Appellee</u>,

         -v.-                                    13-2314(L)
                                                 14-1651(CON)

COURTNEY DUPREE, RODNEY WATTS,
              <u>Defendants-Appellants</u>.<sup>*</sup>

- - - - - - - - - - - - - - - - - - - - -X

FOR APPELLANT DUPREE:        Courtney Dupree, <u>pro se</u>,
                             Otisville, New York.

FOR APPELLANT WATTS:         MARION BACHRACH (<u>with</u> Andy S. Oh,
                             <u>on the brief</u>), Thompson & Knight
                             LLP, New York, New York.

---

<sup>*</sup> The Clerk of Court is directed to amend the case caption as above.

1

**FOR APPELLEE:** CATHERINE M. MIRABILE (with Peter A. Norling, on the brief), for Kelly T. Currie, Acting United States Attorney for the Eastern District of New York, Brooklyn, New York.

Appeal from judgments of the United States District Court for the Eastern District of New York (Matsumoto, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgments of the district court be **AFFIRMED**.

In these consolidated appeals, Courtney Dupree and Rodney Watts appeal from judgments of the United States District Court for the Eastern District of New York (Matsumoto, J.), sentencing Dupree chiefly to 84 months' imprisonment and Watts chiefly to 37 months' imprisonment, after respective juries found them guilty of one count each of bank fraud; two counts each of false statements on a loan application; one count of conspiracy to commit bank fraud as to Dupree; and one count of conspiracy to commit bank, mail, and wire fraud as to Watts. We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

This case arises from a loan procured by GDC Acquisitions, LLC, and its subsidiary companies, which are in the businesses of commercial lighting, office furniture, and office supplies. Dupree was GDC's Chief Executive Officer at all relevant times. Watts was Chief Financial Officer until 2008 and then Chief Investment Officer.

The evidence showed that, to obtain a loan, GDC and the subsidiaries submitted documents to Amalgamated Bank that misrepresented revenues and assets. The misrepresentations included the booking of fictitious sales and the improper accounting of invoices and receipts in order to inflate accounts receivable. In August 2008, Amalgamated agreed to issue a $21 million loan to GDC's subsidiaries, with GDC as guarantor. In the ensuing years the companies provided ongoing financial reports, called borrowing base certificates, which incorporated iterations of these misrepresentations.

Dupree and Watts were tried separately and raise distinct appellate arguments, which we address seriatim.

**Dupree's Appeal**

Dupree, pro se, challenges the sufficiency of the evidence and various evidentiary rulings, and contends that he was framed by the FBI. We review the sufficiency of the evidence de novo, mindful that "a defendant mounting such a challenge bears a heavy burden." United States v. Harvey, 746 F.3d 87, 89 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). We view the evidence in the light most favorable to the government, draw all inferences in the government's favor, and defer to the jury's credibility determinations. Id. The jury's verdict will be sustained if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

We affirm for substantially the reasons stated in the district court's October 26, 2012 order denying Dupree's post-verdict motions. Many of Dupree's sufficiency challenges rely on the premise that his companies did not violate the loan agreement's negative covenant on acquisitions. But Dupree's convictions can be affirmed regardless of the alleged acquisition, based on the other evidence of Dupree's involvement in the scheme to defraud.

When the government charges a scheme to defraud comprising several misrepresentations, it need not prove each misrepresentation. United States v. AMREP Corp., 560 F.2d 539, 546-47 (2d Cir. 1977); see United States v. Stirling, 571 F.2d 708, 726 (2d Cir. 1978) ("The real question, then, is not so much whether there was sufficient evidence regarding each and every specification but, rather, whether there was sufficient overall proof of the alleged scheme to defraud and conspiracy."). There was ample evidence that Dupree knowingly caused others to inflate his companies' assets and income in applying for the loan, and in reports to the bank thereafter.

The district court did not err in precluding expert testimony about the obligations of the parties under the loan agreement, because, as the district court reasonably determined, that was a question for the jury to resolve. See United States v. Duncan, 42 F.3d 97, 101-03 (2d Cir. 1994).

Dupree contends that the bank officer who negotiated the agreement testified as an expert; however, that witness provided only his understanding of the agreement's terms, and

the court instructed the jury accordingly.  Cf. United States v. Ferguson, 676 F.3d 260, 294 (2d Cir. 2011).

Dupree also argues that the FBI framed him by directing one of his employees to create fake invoices; that the employee's actions in providing the government with company documents and information amounted to an illegal warrantless search; that the court precluded Dupree from adducing the motive for the FBI's set-up; and that several witnesses committed perjury.  These claims are not supported by the record:

- The employee who approached the FBI about the fraud testified that he created fake invoices at Dupree's direction before as well as after he contacted the FBI.  The jury considered and rejected Dupree's argument that the FBI concocted the scheme and planted false evidence.

- The FBI did not use the employee as a government agent to obtain evidence but, rather, instructed the employee to continue his work at the company in the normal course.  In any event, Dupree had no legitimate expectation of privacy in the emails in question, which he gave the employee explicit permission to access.

- The "perjured testimony" Dupree identifies amounts to mere inconsistencies in the evidence, many of which were brought out to the jurors.  Dupree thus takes issue with the jury's credibility findings.  Yet "where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997).

- Dupree claims that evidence of the FBI's motive was improperly precluded, but he never sought to introduce it, and the jury was properly instructed with respect to the FBI's investigation.

### Watts's Appeal

Watts contends that his conviction was based on the invalid theory that he falsely inflated revenues by prematurely counting invoices toward accounts receivable.  According to

4

Watts, there was nothing inherently unlawful about the practice of "pre-billing," by which an invoice is recorded as a receivable as soon as the invoice is issued and prior to delivery of the purchased product.

The government did not argue that a fraud is *necessarily* perpetrated by inclusion of an invoice in accounts receivable prior to delivery of the purchased product. Rather, the evidence permitted the jury to find that Watts's conduct with respect to accounts receivable (which went far beyond simply including an invoice prior to delivery of goods) constituted a scheme to defraud the lending bank. Watts's own accounting expert testified that inclusion of an invoice in accounts receivable implies a reasonable expectation of payment. Similarly, the financial statements submitted to the bank asserted that "[a]ccounts receivable are stated at the amount management expects to collect." (Gov. Exh. 148 at 6.) Yet the jury heard evidence that Watts and his co-conspirators included invoices in accounts receivable long before payment was, or could reasonably have been, expected. For example, some invoices that were included in accounts receivable were immediately filed away in a drawer in the billing department, rather than actually sent to a customer. Watts and his colleagues would later alter those invoices, forging details post hoc to bring them into conformity with the details of actual sales and deliveries. Agents from the bank and a mezzanine lender testified at trial that they would not have issued the loan had they been aware of these covert pre-billing practices. This evidence supports the government's theory that the scheme to prematurely and secretly include invoices as accounts receivable was a scheme to defraud the bank, and it permitted the jury to convict Watts.

For the same reasons, we reject Watts's challenge to the jury instructions. We review de novo challenges to jury instructions "but will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice." United States v. Applins, 637 F.3d 59, 72 (2d Cir. 2011) (quoting United States v. Bok, 156 F.3d 157, 160 (2d Cir. 1998)). The defendant bears the burden of showing that the jury charge as issued "misle[d] the jury as to the correct legal standard or [did] not adequately inform the jury on the law," Bok, 156 F.3d at 160 (quoting United States v. Dinome, 86 F.3d 277, 282 (2d Cir. 1996)), and that his requested instruction, by contrast, "accurately represented the law in every respect," United States v. Nektalov, 461 F.3d 309, 314 (2d Cir. 2006) (quoting United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004)).

5

Watts requested a charge that his pre-billing conduct was immaterial as a matter of law, or in the alternative, that the loan agreement's supposed ambiguity (the definition of accounts receivable does not include the word "delivery") must be resolved in Watts's favor. The first request was properly denied because, as explained above, the jury was entitled to find that pre-billing was material. The alternative request was properly denied because it was based on the false premise that, simply because the loan agreement did not explicitly define accounts receivable according to deliveries, the loan agreements must be read to contemplate pre-billing. In contrast to these deficient requests, the district court's jury instructions, viewed as a whole, accurately represented the law.

Also on the subject of pre-billing, Watts argues that the district court erred by admitting evidence of a 2007 instance of pre-billing, which he insists was irrelevant to the 2008 loan. We "review evidentiary rulings for abuse of the district court's broad discretion, reversing only when the court has 'acted arbitrarily or irrationally.'" Nektalov, 461 F.3d at 318 (quoting United States v. SKW Metals & Alloys, 195 F.3d 83, 88 (2d Cir. 1999)). Two witnesses who worked for then-CFO Watts in 2007 testified that he changed or instructed them to change the company's books to suddenly reflect as accounts receivable three to four million dollars of invoices that were attributable to early-stage orders unripe for invoicing. Another witness testified that she provided the company's 2007 financial data, including accounts receivable, to the bank as part of the loan application. The evidence of the 2007 pre-billing episode therefore presented "a question of conditional relevance." United States v. Coplan, 703 F.3d 46, 81 (2d Cir. 2012); see Fed. R. Evid. 104(b). That is, it was relevant only to the extent the jury could reasonably believe that the premature accounts receivable were later submitted to the bank. Since the jury could reasonably find that condition as fact, the district court did not err.

Watts further challenges the exclusion of evidence, in particular a spreadsheet from a GDC subsidiary showing invoices issued prior to delivery of goods during a time interval that preceded GDC's acquisition of the company. Watts attempted to admit the spreadsheet through witnesses who were not competent to attest to its authenticity as a business record. Specifically, Watts's counsel sought to use the spreadsheet to cross-examine government witnesses who had never before seen the spreadsheet, and who even noted aspects of the spreadsheet

6

inconsistent with their memory of the company's business records. Watts's counsel eventually put on a witness who testified that she had seen a similar spreadsheet on a colleague's desk, but could not attest to its contents. The district court therefore admitted the spreadsheet for the fact of its existence but not for the truth of its contents. Our cases call for "a very broad interpretation" of the rules governing qualification of a witness to lay a foundation for admission of business records. United States v. Lauersen, 348 F.3d 329, 342 (2d Cir. 2003) (quoting 5 Weinstein's Federal Evidence § 803.08[8][a] (2d ed. 2003)); see Phoenix Assocs. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995). This interpretation "favors the admission of evidence rather than its exclusion," subject to the "principal precondition . . . that the record has sufficient indicia of trustworthiness to be considered reliable." Phoenix Assocs. III, 60 F.3d at 101 (internal quotation marks and alterations omitted). Even employing this lenient standard, the district court did not abuse its discretion when it limited the purpose for which the spreadsheet could be admitted.

Finally, Watts raises several issues surrounding unrelated bad acts by a government witness, Frank Patello, who replaced Watts as CFO. Patello allegedly exploited an elderly, sickly, and medicated woman, referred to as "R.A." On April 12, 2013, R.A.'s son complained to the FBI that Patello had befriended R.A. in order to trick her into distributing money from her IRA--money that her son would otherwise inherit. On April 19, after a cursory investigation that included interviews with Patello and R.A., the government disclosed the complaint pursuant to Giglio v. United States, 405 U.S. 150 (1972). Watts viewed the complaint as impeachment evidence, arguing that Patello was lying to curry favor with the government in hope of avoiding prosecution. The district court allowed Watts's counsel to cross-examine Patello about this unrelated bad act, but limited the scope of that cross-examination. Among other limitations, the district court barred Watts's counsel from asking about R.A.'s age and medical state. The district court also prevented Watts's counsel from calling as a witness R.A.'s financial advisor to rebut Patello's denial of the exploitation narrative. As to this evidence, Watts argues that: (1) the government violated its obligation under Giglio by stalling unreasonably before disclosing its knowledge of Patello's bad acts, and (2) the district court erred by limiting the scope of his counsel's exploration of Patello's bad acts at trial, such as by limiting his cross-examination and by excluding testimony of the financial advisor.

7

We have declined "to specify the extent or timing of disclosure <u>Brady</u> and its progeny [including <u>Giglio</u>] require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made." <u>Leka v. Portuondo</u>, 257 F.3d 89, 100 (2d Cir. 2001). In <u>Leka</u>, for example, the prosecution had evidence favorable to the defense "early on in th[e] case," <u>id.</u> at 99; nonetheless, until nine days before trial "the prosecution failed to disclose [the evidence], and for a critical time actively suppressed it," <u>id.</u> at 91. Watts relies on <u>Leka</u> to show a <u>Giglio</u> violation, because he did not know of R.A.'s son's complaint until ten days before trial. In this case, however, information about Patello was late-breaking even to the government. The government undertook a one-week-long, cursory investigation before disclosing what it knew. After the disclosure, Watts experienced no difficulty in investigating further, including issuance of a subpoena to R.A.'s financial advisor and examining him in a hearing before the district court. The government performed its <u>Brady</u> and <u>Giglio</u> obligations.

As to the limitations on Watts's cross-examination and the exclusion of testimony by R.A.'s financial advisor, the district court was entitled to preclude the additional testimony, under Federal Rule of Evidence 403. The extrinsic evidence through the financial advisor would have resembled a mini-trial regarding conduct unrelated to this case, and evidence of R.A.'s frailty would have had little probative value and much risk of prejudice. The district court achieved a sensible compromise, allowing Watts's counsel to cross-examine Patello without creating a sideshow of R.A.'s personal and familial misfortunes.

* * *

For the foregoing reasons, and finding no merit in appellants' other arguments, we hereby **AFFIRM** the judgments of the district court.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

8