Jermaine **GARDNER,** Petitioner,

v.

Brian **FISHER,** Defendant.

No. 05 CV 6096(NG)(JMA).

United States District Court, E.D. New York.

April 11, 2008.

Jermaine Gardner, Ossining, NY, pro se.

Charles J. Hynes, District Attorney of Kings County, by: Marie–Claude Palmieri Wrenn, Assistant District Attorney, Brooklyn, NY, for Respondent.

### ORDER

GERSHON, District Judge.

On January 30, 2008, Magistrate Judge Joan Azrack issued a Report and Recommendation recommending that Mr. Gardner's petition for a writ of habeas corpus be denied and directing the parties to submit any objections within ten days of receiving the Report and Recommendation. No objections having been filed, I hereby adopt the well-reasoned and carefully considered Report and Recommendation of Judge Azrack. Accordingly, Mr. Gardner's petition is denied, and since petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied pursuant to 28 U.S.C. § 2253(c).

The clerk of court is directed to enter judgment accordingly.

**SO ORDERED.**

### REPORT AND RECOMMENDATION

AZRACK, United States Magistrate Judge.

The above-captioned petition by Jermaine Gardner ("petitioner") for a writ of habeas corpus was referred to me by the Honorable Nina Gershon, United States District Judge, on October 23, 2006 for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). Petitioner, appearing *pro se*, brings this application under 28 U.S.C. § 2254, challenging his conviction of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree by a jury in New York State Supreme Court, Kings County. Petitioner was adjudicated as a second violent felony offender and sentenced to twenty-five years to life on the murder conviction, along with a concurrent term of fifteen years for the weapon possession conviction. Petitioner is currently incarcerated at Sing Sing Correctional Facility.

Petitioner alleges by his petition that "the verdict was against the weight of the evidence," because one of the two eyewitnesses at trial testified that petitioner was not the perpetrator. Petitioner also claims that his federal constitutional rights were violated when the court refused to impose sanctions after the prosecutor violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), through delayed disclosure of exculpatory evidence

gathered by the police. On the *Brady* issue, petitioner argues in the alternative that the court violated his constitutional rights when it refused to instruct the jury about the late disclosure.

I construe petitioner's weight of the evidence claim as a sufficiency claim [1] and determine that it is barred from federal review because petitioner's counsel procedurally defaulted the claim by failing to object at trial. I find that most of the arguments raised by petitioner in support of his *Brady* claim were similarly defaulted, with the exception of petitioner's claim that the court erred in refusing to instruct the jury regarding the date on which the prosecutor turned over the *Brady* material. I find, however, that the court's denial of that request was proper, and therefore respectfully recommend that petitioner's application for a writ of habeas corpus be denied. I further recommend that no certificate of appealability issue, since petitioner has not demonstrated the substantial denial of a constitutional right.

## I. BACKGROUND

### A. The Underlying Crime

At approximately 5:30 PM on January 2, 2001, Byron Wynn ("Wynn" or "the victim") was shot twice and died on a walkway between 410 Sutter Avenue and 414 Sutter Avenue in Brooklyn, New York. Petitioner was arrested for the crime on January 23, 2001 and indicted by a grand jury on February 8, 2001. He was convicted after a jury trial on March 26, 2002.

### B. Petitioner's Federal Claims in State Court

### 1. The Sufficiency of the Evidence

The testimony of eyewitnesses Magic Allen ("Allen") and Anastasia Hill ("Hill") constituted the evidence material to petitioner's sufficiency challenge. No other eyewitnesses to the shooting testified,[2] and no forensic evidence linked petitioner to the killing.

Allen's testimony provided the core of the prosecution case. Allen lived on the first floor of 414 Sutter Avenue with her three children.[3] (Tr. 184–85.) She had lived in the building most of her life, and knew petitioner because they lived next door to each other there when they were children. (Tr. 187–88, 190, 203–04, 247.) Allen knew petitioner by his street name, "Homo," and saw him around the neighborhood. (Tr. 188–89.) She was closer to petitioner's brother, who went by the street name "Millie/Mo" and whom she had also known since childhood. (Tr. 24849, 261.)

---

1. Petitioner raised this issue in his *pro se* habeas petition in terms of weight of the evidence, a state law claim that is unavailable on federal habeas review. *See Folk v. Philips*, No. 05–CV–557 (NGG), 2007 WL 4264577, at *7 (E.D.N.Y. Nov.30, 2007) (citing the admonition in *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 that "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). It is, however, well-established in the Second Circuit that *pro se* pleadings "must be read liberally" and "should be interpreted to raise the strongest arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (internal citation omitted). For this reason, I construe petitioner's claim here as a federal constitutional challenge to the sufficiency of the evidence on due process grounds—especially because this exact challenge was previously raised at petitioner's trial and in his state court appeal, where petitioner was represented by counsel.

2. Witness Christopher Fraser was inside the lobby of 414 Sutter Avenue at the time of the shooting and saw a man run into the building a short time later. (Tr. 94–96.) His testimony is not material for purposes of petitioner's sufficiency challenge.

3. The victim was the father of Allen's younger two children. (Tr. 191.)

At around 4:30 PM on January 2, 2001, Allen was going out when a man in a wheelchair whom Allen knew from the building, named "Sequan," asked her to bring him back some chicken. (Tr. 186.) When Allen returned with the chicken, Sequan was in the hallway with petitioner, a man called "C–Murder," and "two other guys." (Tr. 187, 224.) Petitioner wore a tan-colored down jacket with white fur around the hood. (Tr. 199–200.) The hood was not up, and Allen saw his face. (Tr. 200.) Petitioner was the only one wearing a jacket with a hood. (Tr. 265–66.) Sequan asked Allen to call Wynn. (Tr. 190–91, 235.) She made the call on the phone in her apartment, then tried to give the phone to Sequan in the hallway. (Tr. 192.) Sequan would not take the phone; petitioner took it instead and talked to Wynn for about five minutes. (Tr. 192, 224.) After petitioner gave the phone back to Allen, she went into her apartment and called Wynn, telling him not to come to 414 Sutter Avenue. (Tr. 193.)

Allen then watched out her bedroom window, which was about six feet from the entrance of the building and looked onto Sutter Avenue. (Tr. 193–97, 271.) Allen saw Wynn get out of a car on Sutter Avenue and approach 414 Sutter Avenue via the walkway. (Tr. 196, 250–51.) Petitioner exited the building with his hood up over his head and met Wynn on the walkway about fifteen feet outside Allen's window. (Tr. 198–200, 204–05, 226, 233–34.) They spoke for five or six minutes, then Allen heard two gunshots and saw petitioner run toward the entrance of 414 Sutter Avenue with a black handgun in his right hand. (Tr. 198–99, 201, 204–05.) As he ran to the building, petitioner's hood came off, revealing his face. (Tr. 199, 201–02.) As he entered the building, petitioner briefly stopped and looked directly at Allen's window from about four feet away,

giving her a clear view of his face. (Tr. 202, 205, 223.)

Anastasia Hill was with Wynn several hours before his killing and saw him talking to a man known to her by the name "Millie/Mo," whom she described as a tall, skinny man from 414 Sutter Avenue wearing a tan-colored jacket with fur on the collar. (Tr. 275–77.) Hill had seen petitioner wearing a similar coat before (Tr. 277), but had not seen petitioner and Millie/Mo wearing the same coat at the same time (Tr. 278). Hill was with Wynn in his car later when he received a phone call and went to 414 Sutter Avenue; she stayed in the car and watched Wynn speak to a person wearing a tan jacket with fur on the collar in front of the building. (Tr. 28183.) At this time, she did not know who the person in the tan jacket was. (Tr. 283.) The person in the tan jacket talked to Wynn for approximately six minutes, then tried to grab him. (Tr. 284.) Hill heard two gunshots, saw Wynn collapse, and saw the person in the tan jacket run into 414 Sutter Avenue. (Tr. 284–85.) Hill denied knowing the identity of the shooter. (Tr. 283.)

Immediately after he rested, defense counsel stated, "I wish the Court to rule that there is insufficient evidence to go to this jury for them to determine the guilt or innocence of the defendant .... [t]he People have placed into issue the question of whether or not Magic Allen is correct or the other young lady, Ms. Hill, is correct. Based upon that, I don't think there is anything for this jury to deliberate upon. We have two diametrically opposed statements." (Tr. 362:22–363:18.) Noting that Hill had repudiated out-of-court statements she made to the police that another man committed the crime (discussed more fully below), and that in any case her prior statement was not admitted for the truth of the matter asserted, the court denied

the defense application, stating, "It's a question of credibility for the jury." (Tr. 364:4–5.) Defense counsel did not take exception to the court's ruling.

On appeal to the Appellate Division, petitioner argued that the verdict was against the weight of the evidence because the prosecution failed to prove his identity as the shooter by legally sufficient evidence. (Resp. Ex. B: Brief for Def.-App., at 27–36.) On October 22, 2004, the Appellate Division unanimously held that "[t]he defendant's claim that the evidence at trial was legally insufficient to establish his guilt is unpreserved for appellate review," citing N.Y.Crim. Proc. Law § 470.05(2), *People v. Gray*, 86 N.Y.2d 10, 629 N.Y.S.2d 173, 652 N.E.2d 919 (1995), and *People v. Udzinski*, 146 A.D.2d 245, 541 N.Y.S.2d 9 (2d Dep't 1989). *People v. Gardner*, 12 A.D.3d 525, 785 N.Y.S.2d 462 (2d Dep't 2004). The Second Department also held that the evidence, viewed in the light most favorable to the prosecution, was legally sufficient, and that, "[u]pon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id.* (internal citation omitted).

The New York Court of Appeals denied leave to appeal by order dated January 4, 2005. *People v. Gardner*, 4 N.Y.3d 763, 792 N.Y.S.2d 7, 825 N.E.2d 139 (2005).

### 2. The *Brady* Issue

On March 19, 2002, after jury selection and before opening arguments, the prosecutor turned over unspecified discovery material as required by *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961).[4] (Tr. 3–4.) A police report ("DD5") summarizing the January 3, 2001 interview of Hill, prepared by Detective Phillip Palmeri ("Palmeri") on that same day, appears to have been turned over to the defense for the first time as part of the Rosario material.[5] According to the DD5, Hill told Palmeri that she saw the victim speaking to Millie/Mo, then saw something that could have been a gun in Millie/Mo's hand and heard three shots. (Tr. 77–78.) Wynn ran away, but Millie/Mo pursued him and stood over Wynn as Wynn lay on the ground. (Tr. 78.) Hill heard three more shots, then Millie/Mo ran into 414 Sutter Avenue. (Tr. 78.) Hill did not sign the DD5 itself, but the DD5 was prepared from a handwritten statement that Hill did sign—which the police later lost and was thus never provided to the defense. (Tr. 77, 78, 124.)

On March 20, 2002, after testimony began, defense counsel informed the court about the late disclosure of the DD5 and indicated that he believed that it constituted a *Brady* violation because he should have been able to investigate Hill's statement before trial. (Tr. 76–78.) The court agreed that the statement appeared to be

---

**4.** In *Rosario*, the New York Court of Appeals held that the prosecution must turn over to the defense all prior statements by a prosecution witness that relate to the subject matter of the witness's testimony. 9 N.Y.2d at 289, 213 N.Y.S.2d 448, 173 N.E.2d 881.

**5.** The record is unclear about exactly when the DD5 of Hill's statement was disclosed. The only reference to discovery in the trial transcript is a contemporaneous reference to the *Rosario* disclosure on March 19, 2002. On March 20, 2002, defense counsel said "I

received the discovery material, all of the DD–5's, on Monday [i.e., March 18]—I think it was Monday; is that correct?" to which the prosecutor responded, "Yes." (Tr. 76:20–23.) The defendant's appellate brief implies that the DD5 of Hill's statement was turned over with the *Rosario* material on March 19 (Brief for Defendant–Appellant at 11, *People v. Gardner*, 12 A.D.3d 525, 785 N.Y.S.2d 462 (N.Y.App. Div., 2d Dept., April 2004)), while the prosecution's brief indicates that the disclosure occurred on March 18 according to the defense (Respondent's Brief at 2).

*Brady* material (Tr. 79), and indicated that the defense would be allowed to introduce the DD5 if unable to locate Hill as a witness (Tr. 83). The court later that day indicated that "if the People are able to produce Anastasia Hill in Court tomorrow that will take care of the situation." (Tr. 117.)

On March 21, 2002, the prosecutor indicated that he would call Hill that day. (Tr. 122.) Defense counsel stated that he did not believe Hill's testimony would cure the *Brady* problem. (Tr. 123). The court asked defense counsel what remedy he sought; defense counsel requested no specific remedy, but stated that he would not move for a mistrial. (Tr. 124.) Defense counsel never asked for a continuance to investigate Hill's DD5 statement. The court suggested an instruction to the jury that it could draw an adverse inference if it believed the loss of Hill's handwritten signed statement was intentional. Defense counsel stated he would seek a different charge and would advise the court later as to the specific request, but asked to defer the discussion until the charging conference. (Tr. 124–26.)

Hill's trial testimony, as described above, contradicted the DD5. At trial, she insisted that she did not know the identity of the person in the tan jacket at the time of the shooting. (Tr. 283.) Hill recounted that, in the early morning hours of January 3, 2001, Palmeri took her to the precinct from her grandmother's home. (Tr. 289–90.) Hill gave Palmeri her account, but she was upset, uncooperative, and did not get along with Palmeri. (Tr. 290–91.) When she told Palmeri that the shooter was wearing the same coat Millie/Mo had been wearing earlier, Palmeri "kept trying to make me say Millie–Moe killed Byron," but Hill never said so. (Tr. 291–92, 299300.) Hill denied telling Palmeri that she heard three shots, then three more shots while the shooter was standing over

Wynn. (Tr. 292.) Although Hill signed the statement Palmeri had prepared, she did not read it first because she wanted to leave the precinct as quickly as possible. (Tr. 292–93.) Defense counsel cross-examined Hill extensively using the contents of the DD5. (Tr. 297–99.)

Detective Palmeri testified that Hill told him exactly what was recorded in the DD5: that Millie/Mo talked to Wynn, then shot Wynn three times, and then shot Wynn three more times while Wynn was on the ground. (Tr. 317–18.) Palmeri knew at the time that Hill's testimony did not match the ballistics evidence, but wrote it down anyway because that was what Hill told him. (Tr. 318–19.) Palmeri had Hill sign the written statement after he took it down, then typed all of the information onto the DD5. (Tr. 320–21). Palmeri later lost the written statement. (Tr. 321.)

On March 25, 2001, prior to summations, defense counsel requested, as a remedy for the *Brady* violation, that a stipulation be entered that the defense first received Hill's statement on March 18, 2001 so the jury would know of the late disclosure. (Tr. 357.) Defense counsel explained that he wanted to prevent the jury from inferring that he had ample time to investigate Hill's statements and did not call her because he realized that her trial testimony was accurate. (Tr. 358–59.) The court denied the application. (Tr. 359–61.) After defense counsel took exception (Tr. 360), the court explained its reasoning: "If there is evidence that you got this statement way back at the beginning of the case, you would not want the jury to draw the inference that, well, look at all of the time [defense counsel] had to investigate, and because he did not call any witnesses, he must believe therefore what she had to say—you see, the other side of the argument that would pertain if you got the

statement a year and a half ago, makes what you want me to say to the jury improper?" (Tr. 361.) Defense counsel twice reiterated his exception. (Tr. 360, 362.)

After summations, the court charged the jury without including an adverse-inference charge on the loss of Hill's signed statement or a stipulation about when the DD5 statement was turned over to the defense. (*See* Tr. 420–461.) After the charge was given, defense counsel stated that he had no requests or exceptions. (Tr. 461.)

Defense counsel raised the *Brady* issue again between the verdict and sentencing in a motion under N.Y.Crim. Proc. Law § 330.30. Defense counsel argued that, in line with *Leka v. Portuondo,* 257 F.3d 89 (2d. Cir.2001), the lateness of the *Brady* disclosure prevented him from effectively speaking to Hill, investigating her statements, or using her as a witness at trial. (Sentencing Transcript ("Sent.Tr.") 3–7.) By the time defense counsel was aware of Hill's exculpatory statement, Hill had been compromised by sitting with the family of the victim in court. (Sent. Tr. 5.) Defense resources had been directed towards the trial, and his failure to ask for a continuance was excusable because a continuance would have been too little, too late, and ineffective to cure the *Brady* violation. (Sent. Tr. 5–6, 9–10.) Defense counsel requested that the verdict be set aside and that petitioner be granted a new trial. (Sent. Tr. 7.) The court denied the motion, finding that there was no reasonable possibility that the verdict would have been more favorable to petitioner even if the *Brady* disclosure had been timely. (Sent. Tr. 11–12.)

On direct appeal, petitioner argued that the late disclosure of Hill's DD5 statement violated his due process right to a fair trial under the federal constitution and *Brady* because it deprived him of the opportunity to investigate Hill's statement. Appellate counsel argued, in the alternative, that the Court's refusal to instruct the jury that Hill's statement was disclosed late violated due process. (*See* Resp. Ex. B.) The Appellate Division of the Supreme Court, Second Department, affirmed petitioner's conviction. *People v. Gardner,* 12 A.D.3d 525, 785 N.Y.S.2d 462 (2d Dep't 2004). In response to petitioner's argument that the late disclosure violated his due process rights, the court stated, "The defendant's claim ... is unpreserved for appellate review," citing N.Y.Crim. Proc. Law § 470.05(2), *People v. Gray,* 86 N.Y.2d 10, 629 N.Y.S.2d 173, 652 N.E.2d 919 (1995), and *People v. Bynum,* 70 N.Y.2d 858, 523 N.Y.S.2d 492, 518 N.E.2d 4 (1987). *Gardner,* 785 N.Y.S.2d at 462. The Second Department also addressed the merits, rejecting the delayed-disclosure *Brady* claim because defense counsel had sufficient time to use the DD5 and there was "no indication that a reasonable possibility exists that earlier disclosure of the material might have led to a different outcome." *Id.* The Second Department did not specifically mention or rule on petitioner's alternative argument, that the court violated *Brady* in refusing to instruct the jury that Hill's statement was turned over to the defense late. The Court of Appeals subsequently denied petitioner's request for leave to appeal. *People v. Gardner,* 4 N.Y.3d 763, 792 N.Y.S.2d 7, 825 N.E.2d 139 (2005); *see also* Resp. Ex. D.

## II. DISCUSSION

### A. Procedural Requirements for Habeas Relief

I find that petitioner's habeas claims were filed timely and properly exhausted in state court, but determine that his sufficiency of the evidence claim and most aspects of his *Brady* claim are nonetheless barred on independent and adequate state law grounds due to procedural default un-

der the New York preservation statute, N.Y.Crim. Proc. Law § 470.05(2). However, I find that petitioner's alternative *Brady* claim was fairly presented to the state courts and was not procedurally defaulted, making it available for habeas review.

### 1. Timeliness

Petitions by state prisoners for habeas corpus relief are subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 (1996). Under AEDPA, a petitioner must file a habeas application in federal court within one year of the date on which the petitioner's state court conviction became final. 28 U.S.C. § 2244(d)(1). Petitioner's application for leave to appeal to the New York Court of Appeals was denied on January 4, 2005. *Gardner,* 4 N.Y.3d 763, 792 N.Y.S.2d 7, 825 N.E.2d 139. His conviction became final on April 4, 2005, the date on which his time to seek a writ of certiorari from the United States Supreme Court expired. *See McKinney v. Artuz,* 326 F.3d 87, 96 (2d Cir.2003) (citing Sup.Ct. R. 13(1) ("A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review.")). Petitioner timely filed his application on December 22, 2005, well within the year allowed by the statute.

### 2. Exhaustion of State Remedies

■ AEDPA requires that "an application for a writ of habeas corpus … shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). To satisfy the exhaustion requirement, the petitioner must "fairly present" his federal claim to the highest state court from which a decision can be rendered. *See Daye v. Att'y Gen. of New York,* 696 F.2d 186, 190–91 n. 3 (2d Cir.

1982) (en banc). Fair presentation requires that the petitioner first inform the state courts of the factual and legal bases of the claim, with specific reference to the federal constitutional grounds for relief. *Id.* at 191; *see also Baldwin v. Reese,* 541 U.S. 27, 33, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004). The exhaustion requirement stems from a desire to maintain comity in our federal system, and from the duty of the state courts to apply federal constitutional protections in the first instance. As the Supreme Court has said, comity necessitates that "the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Here, petitioner based his direct appeal squarely on federal constitutional grounds. His appellate brief first argued that his guilt was not proven by evidence beyond a reasonable doubt, specifically citing the due process clause of the Fourteenth Amendment to the United States Constitution. (*See* Resp. Ex. B: Brief for Def.-App., at 27–29.) The brief also raised the *Brady* issue in federal due process terms. (*See id.* at 36–40.) Finally, petitioner couched his alternative argument, that the court's rejection of his proposed jury charge was error, in federal constitutional terms. (*See id.* at 44–46, 50.) I find on this basis that petitioner exhausted his federal constitutional claims in state court, satisfying AEDPA's exhaustion requirement.

### 3. Procedural Default on Independent and Adequate State Law Grounds

■ The doctrine of the independent and adequate procedural bar to federal habeas relief predates the passage of AEDPA in 1996, *see, e.g., Coleman,* 501 U.S. at 730, 111 S.Ct. 2546 (a 1991 decision), and continues to apply in the wake of

AEDPA, see *Jimenez v. Walker*, 458 F.3d 130 (2d Cir.2006). The doctrine holds that a state may legitimately incarcerate a prisoner with valid federal constitutional claims of error if those claims were defaulted under an independent and adequate state procedural rule (typically a preservation requirement). *See Harris v. Reed*, 489 U.S. 255, 260, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[t]he adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment ..."). In such cases the state procedural default provides a valid basis for holding the prisoner, despite any federal constitutional claims of error, and the prisoner is not entitled to habeas relief.

■ The Supreme Court has limited this doctrine to situations in which, beyond the mere existence of a state procedural default, the state court actually "relied on the procedural bar as an independent basis for its disposition of the case.... [W]e will not assume that a state-court decision rests on adequate and independent state grounds when the state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Caldwell v. Mississippi*, 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (internal quotations omitted); *see also Jimenez*, 458 F.3d at 145 (explaining that without "a clear and express statement of reliance on a state procedural bar," state court decisions are presumed to rest on the merits). The highest state court that rendered a judgment in the case must have "clearly and expressly state[d] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038,

103 L.Ed.2d 308 (1989) (citation and internal quotation marks omitted). The doctrine applies even where a state court finds the claims procedurally barred and reaches the merits of a petitioner's claim in the alternative. *See Harris*, 489 U.S. at 264 n. 10, 109 S.Ct. 1038 ("[A] state court need not fear reaching the merits of a petitioner's claim in the alternative."). For example, where a state court says that a claim is "not preserved for appellate review," and then rules "in any event" on the merits, such a claim is not preserved. *Glenn v. Bartlett*, 98 F.3d 721, 724–25 (2d Cir.1996); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990).

Both the Supreme Court and the Second Circuit have held that failure to object contemporaneously is an adequate and independent state ground that bars federal review. *See Wainwright v. Sykes*, 433 U.S. 72, 86, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir.1999). The contemporaneous objection rule recognizes that the state has a strong interest in requiring parties to bring "any matter which a party wishes the appellate court to decide ... to the attention of the trial court at a time and in a way that [gives] the latter the opportunity to remedy the problem and thereby avert reversible error." *Rolling v. Fischer*, 433 F.Supp.2d 336, 346 (S.D.N.Y.2006) (citing *People v. Luperon*, 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 647 N.E.2d 1243 (1995)).

■ Here, the Second Department clearly held that petitioner's "contention that the evidence at trial was legally insufficient to establish his guilt is unpreserved for appellate review," and cited as support the New York preservation statute, N.Y.Crim. Proc. Law § 470.05(2), and two New York cases construing that statute.[6] *See Gardner*, 785 N.Y.S.2d at 462. Like-

---

6. *People v. Gray*, 86 N.Y.2d 10, 629 N.Y.S.2d

173, 652 N.E.2d 919 (1995) and *People v.*

wise, the appeals court held that petitioner's "claim that the judgment of conviction should be reversed based upon the late disclosure of *Brady* material is unpreserved for appellate review." *Id.* Again, the court cited the preservation statute and New York case law. *Id.*

I also note that petitioner's *Brady* arguments made on the basis of *Leka*, 257 F.3d 89, which argued that the disclosure was "too little, too late" and therefore required a new trial, were unpreserved; New York law requires that such contentions be raised earlier. *People v. Davidson*, 98 N.Y.2d 738, 739, 751 N.Y.S.2d 161, 780 N.E.2d 972 (2002) (holding that a constitutional challenge first raised in a N.Y.Crim. Proc. Law § 330.30 motion was too late to preserve the issue for appellate review).

Because the appellate ruling was explicitly based on an adequate and independent state procedural default, I find that the petitioner's claims that the evidence was insufficient, and that his conviction should be reversed because of late *Brady* disclosure, are unavailable on habeas review. I therefore respectfully recommend that these claims be denied.

### 4. The Exception to the State Procedural Bar

■ There is one exception to the independent state procedural ground bar. A federal court can still review a claim that was defaulted on state procedural grounds if the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. Here, petitioner neither asserts this exception, nor does my careful review of the record demonstrate that there would be any basis for asserting it. I therefore find that the exception to the state procedural default doctrine does not apply in this case.

### 5. Petitioner's Alternative *Brady* Claim is Preserved for Review

■ As already discussed, petitioner's attorney moved the trial court for relief on *Brady* grounds by asking that the jury be instructed as to the date on which the prosecutor provided defense counsel with Hill's exculpatory DD5 statement. The court denied the motion, discussing its rationale at some length. During that discussion, defense counsel clearly took "an extreme exception" to the court's ruling, and repeated the exception two more times. This appears sufficient under New York law to preserve counsel's objection for appellate review. *See, e.g.*, N.Y.Crim. Proc. Law § 470.05(2) (stating that a question of law is presented for appellate review when the party claiming error "made his position with respect to the ruling or instruction known to the court" at the time of the ruling or any time "when the court had an opportunity of effectively changing the same."); *see also Gray*, 86 N.Y.2d 10, 629 N.Y.S.2d 173, 652 N.E.2d 919 (1985) (indicating that an issue is preserved for appellate review when a specific objection is made at trial). Defendant subsequently raised the argument to the Appellate Division that this error violated petitioner's federal due process rights. (*See* Resp. Ex. B: Brief for Def.-App., at 44–50.) The Second Department's decision made no reference to this alternative claim. *See Gardner*, 785 N.Y.S.2d at 462. Noting that the claim was plainly preserved at trial and properly presented on appeal, I find this claim to be properly presented for habeas review.[7]

*Udzinski*, 146 A.D.2d 245, 541 N.Y.S.2d 9 (2d Dep't 1989).

7. It is notable in this context that respondent's memorandum of law in opposition to the instant petition also failed to address the

## B. Standard of Review

AEDPA established a deferential standard of review that allows federal habeas courts to grant the writ to a state prisoner on a claim that was "adjudicated on the merits" in state court only if adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). An adjudication "on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (internal quotation omitted).

The Second Circuit has discussed, but not decided, what standard of review to apply where, as here, the state appeals court implicitly rejects, without specific mention or ruling, a particular constitutional claim raised in the appeal. In *Su v. Filion*, 335 F.3d 119, 126 n. 3 (2d Cir. 2003), the Second Circuit noted in a footnote the possibility that a situation might arise in which, "because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." In the recent case *Jimenez v. Walker*, 458 F.3d 130, 143 (2d Cir.2006), the Second Circuit provided a broad overview of its post-AEDPA case law on standards of review, including *Su*. The Circuit Court quoted its decision in *Boyette v. Lefevre*, 246 F.3d 76, 91, which indicated that "when a state court has articulated its reasons for rejecting some elements of a federal claim, AEDPA deference applies only to the elements that the state court discussed. Thus, a federal court may grant the writ under AEDPA if the adjudication of the discussed elements

issue of the rejected jury instruction. (*See*

was objectively unreasonable and the adjudication of the undiscussed elements was simply erroneous." However, in a footnote, the Second Circuit again left undecided the question of what standard of review to apply where the state appellate court simply failed to rule on a federal constitutional claim raised on appeal. The Court refrained from endorsing the rule in *Boyette*, and stated that "one might well question why the extent of the state court's explanation changes the nature of federal habeas review as constrained by § 2254(d). Rather, § 2254(d)(1) might best be read as being satisfied by a finding of unreasonable error as to any one element of a federal claim, regardless of how many elements the state court discussed. After all, § 2254(d)(1) speaks of a decision that 'involved an' unreasonable application of law, not a decision that 'consists entirely of' unreasonable applications of law." *Jimenez*, 458 F.3d at 143, fn. 12.

In this case, the issue need not be resolved, since it is clear that the petitioner's preserved *Brady* claim fails on the merits even without the application of AEDPA's deferential standard.

## C. Petitioner's Preserved *Brady* Claim Has No Merit

██ Petitioner's preserved *Brady* assertion fails because the court's refusal to give his proposed jury instruction did not result in any prejudice to petitioner.

██ Under *Brady* and its progeny, a violation of federal due process rights will be found when three factors are met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v.*

*generally* Resp. Mem. of Law, Dkt. No. 6.)

*Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).[8] Here, there is no question that the first two prongs were met: Hill's DD5 statement was exculpatory, and it was not disclosed until at least the beginning of the trial.

Typically, the prejudice prong in a *Brady* case arises when complete suppression has kept the petitioner in the dark as to the exculpatory content of the statement. In the current case, the question arises in an idiosyncratic context, given the disclosure of Hill's DD5 statement, however late, and its use by defense counsel at trial. Although, as discussed above, petitioner's argument that this was "too little, too late" is procedurally barred from habeas review, it does tend to show that no prejudice resulted from the suppression of the contents of Hill's statement. The defense was not prejudiced by learning at the last minute that Hill initially identified Millie/Mo as the killer, since the defense made effective use of this statement at trial through extensive cross-examinations of both Hill and Palmeri. This is an adequate remedy for late *Brady* disclosure. *See, e.g., U.S. v. Coppa,* 267 F.3d 132, 142 (2d. Cir.2001) ("[W]e have never interpreted due process of law as requiring more than that *Brady* material must be disclosed in time for its effective use at trial") (citations omitted); *U.S. v. Smith Grading and Paving,* 760 F.2d 527 (4th Cir.1985) (no *Brady* violation when late-disclosed exculpatory information was put before the jury during cross-examination); *U.S. v. Bencs,* 28 F.3d 555 (6th Cir.1994) (same); *U.S. v. Adams,* 834 F.2d 632 (7th Cir.1987) (no *Brady* violation when defense made use of latedisclosed exculpatory statement on cross and did not request a continuance.)

The defense argued at the § 330.30 hearing, and on appeal, that the Second Circuit case *Leka v. Portuondo,* 257 F.3d 89 (2d. Cir.2001) controlled, citing it for the proposition that exculpatory evidence disclosed on the eve of trial prejudiced the defense by preventing adequate investigation of the evidence and therefore precluding effective use. In *Leka,* however, the prosecutor never disclosed the full contents of the exculpatory statement, and the defense investigation was stymied when the court issued a protective order barring the defense from contact with the witness. *Id.* at 102–03. The *Leka* court found a *Brady* violation because the defense was never able to present the exculpatory information at trial. *Leka* simply does not apply to the current case, where defense counsel used Hill's DD5 statement extensively on cross.

Defense counsel, in requesting the jury instruction, alleged a distinct prejudice caused by the delayed *Brady* disclosure: that the jury, noticing that the defense did not put forward evidence corroborating Hill's DD5 statement by suggesting that Millie/Mo killed Wynn, would infer from this that the defense had investigated Hill's DD5 statement and concluded that it was false. Defense counsel proposed that this alleged prejudice would be averted if the jury was told that he received the exculpatory statement at the last moment, because this would counter any inference that the defense had time to investigate the merits of the statement.

I cannot find that petitioner's federal constitutional rights were prejudiced by the trial court's refusal to give this proposed instruction. To show prejudice under *Brady,* the petitioner must show that the alleged error created a "reasonable probability that the results of the trial would have been different," precluding "a

---

8. The prejudice spoken of in the third prong of the *Strickler* analysis is distinct from the "cause and prejudice" that must be shown to permit a claim defaulted in state court to nonetheless be heard on federal collateral review, as discussed *supra,* Section II(A)(4).

trial resulting in a verdict worthy of confidence." *Id.* at 289–90, 119 S.Ct. 1936 (internal citations and quotations omitted). The court's rejection of the proposed jury instruction, however, did not undermine confidence in the verdict.

Prejudice cannot be shown in this limited context because the requested charge was unnecessary. The tardy *Brady* disclosure had already been remedied by defense counsel's effective use of Hill's DD5 statement to cross-examine both Hill and Palmeri regarding the inconsistencies between Hill's DD5 statement and her testimony at trial. Thus, the jury instruction that the defense sought was unnecessary and inappropriate. It cannot be said that the trial court undermined confidence in the verdict by rejecting an unnecessary and arguably misleading instruction.

Even assuming, *arguendo,* that some *Brady* prejudice lingered despite the effective use of Hill's DD5 statement, defense counsel's proposed instruction merely sought to substitute speculation about hypothetical jury inferences for investigation. To echo defense counsel's own argument, the proposed jury instruction was too little, too late—and the wrong sort of remedy—to properly address any *Brady* concerns that might have remained after his use of the exculpatory statement. The proposed jury instruction would not have created more confidence in the outcome; in fact, if the proposed instruction had been given, the verdict would arguably have been *less* worthy of confidence because the instruction would have encouraged the jury to engage in improper speculation, without evidence, as to what investigations were or were not conducted. I therefore find petitioner's *Brady* claim without merit, under any standard of review.

## III. CONCLUSION

For the reasons set forth above, I respectfully recommend that Petitioner's application for a writ of habeas corpus be denied. I further recommend that a certificate of appealability not issue, as petitioner has failed to make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *see also Miller–El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (indicating that a substantial showing is made when the "resolution was debatable amongst jurists of reason.").

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

SO ORDERED.

Jan. 30, 2008.