IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MCARTHUR RISPER, | § | |
| | § | No. 56, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 1805007714A(S) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: January 27, 2021
Decided: April 6, 2021

Before **SEITZ**, Chief Justice; **TRAYNOR** and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Nicole M. Walker, Esquire, OFFICE OF PUBLIC DEFENDER, Wilmington, Delaware, *for Appellant McArthur Risper*.

Andrew J. Vella, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

A Superior Court jury found McArthur Risper guilty of murder in the first degree, conspiracy in the first degree, and possession of a firearm during the commission of a felony for his role in the May 2018 shooting death of Corey Bailey. The Superior Court sentenced Risper to life plus 30 years in prison.

The theory of the prosecution was that Risper intentionally killed Bailey as revenge for Bailey's theft of drugs and a firearm belonging to Risper. Risper claims that the evidence of Bailey's theft and Risper's subsequent efforts to recover the stolen drugs and firearm was prior-misconduct evidence and therefore inadmissible under our rules of evidence. In this opinion, we conclude that the Superior Court did not abuse its discretion when it admitted the challenged evidence.

But Risper also claims that he did not receive a fair trial because the State did not disclose in a timely manner evidence that was favorable to the defense as required under *Brady v. Maryland*[1] and its progeny. According to Risper, the State's belated disclosures—one on the day before trial was to begin and the other on the fourth day of trial—fundamentally undermined the fairness of his trial. We agree with Risper and conclude that the State's failure to produce, until the afternoon before Risper's trial was to begin, a recorded interview of an individual who told the chief investigating officer that another person had confessed to her that he had killed

---

[1] 373 U.S. 83 (1963).

Bailey and showed her the gun used in the shooting was a violation of the State's obligations under *Brady*. And because that violation undermines our confidence in the outcome of Risper's trial, we reverse and remand to the Superior Court for a new trial.

## I.      FACTUAL BACKGROUND

During the early evening hours of May 11, 2018, Channell Gray was standing in front of her car on Mill Park Drive in the Coverdale Crossroads community near Bridgeville, Delaware, talking with her friend, Corey Bailey. When a black Jeep pulled up, Bailey anticipated trouble, immediately handing his phone to Gray and exclaiming, "these MFers got me, . . . go get Dane."[2] Two men, wearing gloves and masks that only partially covered their faces, leaving their eyes, eyebrows, and noses exposed, got out of the Jeep and approached Bailey and Gray.

The man who alighted from the Jeep's front passenger seat walked toward Bailey, aimed a handgun at him, and fired it several times, killing Bailey. Gray recognized the shooter as McArthur Risper, a man she had known for over a decade because he "used to go with [her] cousin."[3] Consequently, Gray identified Risper as the shooter in a photographic lineup later that evening and again at trial.

---

[2] App. to Answering Br. at B54. Dane is Channell Gray's husband. *See id.*
[3] App. to Opening Br. at A134.

3

To shed light on Bailey's suspicion that the arrival of the black Jeep foretold trouble, we must revisit the events of the three weeks preceding Bailey's fatal encounter with the masked shooter. As we summarize the evidence, we are mindful that some of it was admitted over Risper's objection. To the extent relevant to the issues Risper raises in this appeal, we reserve for later consideration the Superior Court's ruling on those objections.

About three weeks before Bailey's murder, he and his girlfriend, Staci Weldon, broke into a trailer on Camellia Drive in Bridgeville, intending to steal a television. Instead of taking a television, however, they stole an AR15 assault rifle and two large bags of marijuana, weighing between two and four pounds. At the time of the burglary Weldon did not know who owned the trailer, but afterwards Bailey clued her in as evidenced by Weldon's trial testimony:

> Q. Did Corey ever indicate to you that there may be a consequence for stealing the drugs and marijuana . . . ?
> A. Yeah. After we left, he kind of explained what he thought would happen.
> Q. . . . And what did he explain to you?
> A. He pretty much told me that there was going to be people after us for doing what we did.
> Q. Did he say which people?
> A. Yes.
> Q. And which people were they?
> A. That would be his cousin and his cousin's friend.
> Q. Do you know who his cousin is?
> A. Yes.
> Q. Who was it?

4

A.    McArthur.[4]

The stolen marijuana and assault rifle did not make it home with Bailey and Weldon.  Instead, the two stopped at the residence of a friend, O'Shea Waples, where they left the weapon—"until [Bailey] found a buyer—and some of the weed."[5] Bailey and Weldon "traded" the marijuana that they did not leave with Waples.[6] After leaving the stolen marijuana and assault rifle with Waples, Bailey told Waples that people were after him because of "what he [(Bailey)] gave [Waples]."[7]  At the time, Waples did not know the men seeking revenge, but Bailey later identified them as "Bug" and "Mike."[8]

It does not appear as though Bailey ever returned to retrieve the weapon or the marijuana.  But during the first week of May, Waples received two visits, the first from a man named "Mike," later identified as Mike Lewis, and the second from Lewis and another man who was identified as "Bug."  At trial, Waples identified "Bug" as Risper.  When Lewis arrived alone at Waples' mobile home, he demanded the return of the weapon and marijuana Bailey had left with Waples several days earlier, "[a]nd he pulled out a gun."[9]  Lewis left with the weapon but no marijuana.

---

[4] *Id*. at A202.
[5] *Id*. at A201.
[6] *Id.* at A218.
[7] *Id.* at A238.
[8] *Id.*
[9] App. to Answering Br. at B314.

Lewis returned to Waples' trailer later that night with Risper; both men were dressed in black clothes, including black "hoodies" which, in Waples' eyes, meant that they were not "coming to play or nothing."[10] Waples could see a "gun butt"[11] protruding from Risper's jacket. Lewis and Risper searched Waples' car and his bedroom looking for the stolen marijuana. Finding none, they took some of Waples' jewelry as payment for the missing marijuana.

The evidence suggests that Bailey was keenly aware that Risper would exact a price for his theft of the marijuana. Bailey told Weldon as much, and his suspicions were only confirmed by the home invasion at Waples' mobile home.

We fast forward to May 11, the day of Bailey's murder. Bailey spent most of that day "just riding . . . around"[12] with Devean Sheppard. As they rode, Bailey confided in Sheppard: "I got folks trying to kill me."[13] When Sheppard pressed Bailey to identify the "folks" he was referring to, "[h]e said, man, my peoples,"[14] which Sheppard understood to mean Risper. Later, Sheppard and Bailey saw Laval Farmer and Risper slowly passing by in a truck. Sheppard described Bailey's reaction to this encounter: "And this is when I really knew he was serious when I

---

[10] App. to Opening Br. at A243.
[11] *Id.* at A245.
[12] *Id.* at A281.
[13] *Id.* at A280.
[14] *Id.* at A281.

seen him jump in my seat when he seen that truck come by.  He was like, oh, there they go."[15]

Other witnesses also saw Risper in a black Jeep on the day of Bailey's murder. For example, Hayward Risper—defendant Risper's cousin—saw Laval Farmer driving a black Jeep with Risper in the passenger seat on the day of the murder. Throughout that day, Hayward saw the Jeep drive through the neighborhood over five times.  According to Hayward, it was not normal to see Farmer and Risper driving through the neighborhood.

Hayward spent most of the day barbequing and drinking a few beers with Guan Davis.  Davis—Risper's nephew—also saw Farmer and Risper driving around the neighborhood throughout the day.  Later that evening, Hayward and Davis heard gun shots—Davis initially believed the noise to be fireworks—and then saw the same Jeep, this time with Risper behind the wheel, speeding away from the shooting. Hayward attempted to stop Risper as he drove off, but to no avail.  Davis testified that, after hearing the shots, he saw a black truck driven by Farmer pull up to Farmer's house.  After entering his home, Farmer emerged five minutes later wearing different clothing.  Thus, a conflict exists between Hayward's and Davis's account of who was driving the black SUV after they heard shots.  Later that same

---

[15] *Id.*

evening, Hayward called Risper to discuss the shooting. During that phone call, Risper denied any involvement, but asked if Bailey was dead.

Earlier that same day, another witness, Shika Cannon, saw Risper, with whom she went to school, driving the black Jeep in the vicinity of the murder. In fact, Cannon was with Bailey and Channell Gray immediately before Bailey was shot. After talking with Bailey and Gray, Cannon went inside her house with her children to use the bathroom. Once inside, she heard gunshots. She then ran outside and saw "a black Jeep pulling off."[16]

After the shooting, Risper asked Teara Harris—a close friend—to rent a hotel room in Salisbury, Maryland for Risper's long-time girlfriend, Desira Sutton. Harris believed Sutton wanted the room because "the police was coming there, and she didn't want to be there with the kids."[17] According to Sutton, Risper wanted to rent the hotel room so he could spend time with their children before he turned himself in to the police. While the couple stayed in the hotel, Sutton was unaware of the location of the Jeep. Sutton was the owner of the Jeep, but she testified that Risper was its primary operator.

The day after Bailey's murder, Risper's black Jeep appeared at Harris's house in Maryland without explanation. Confused and nervous about the car being in front

---

[16] App. to Answering Br. at B310.
[17] *Id.* at B275.

of her house, Harris drove the Jeep to a gas station in Maryland. But before she left the Jeep at the gas station, Harris wiped down all of the areas that she thought she had touched. Harris then told Sutton the location of the Jeep.

Approximately a week after the shooting, police—with the help of Sutton—located the Jeep at the gas station in Maryland. Inside the Jeep, police found fifteen cellphones, an ID belonging to James Harmon, a black cap, and a black ski cap in the rear of the vehicle. Police also processed the Jeep for fingerprints and DNA. After processing the Jeep and its contents, police found Risper's DNA on the steering wheel, a cellphone, and a black ski mask.

## II. RELEVANT PROCEDURAL HISTORY

### A. Motion *in Limine*

The State filed a pretrial motion *in limine* seeking a determination that evidence of Risper's possession of marijuana and a firearm and his attempt, during the Waples home invasion, to recover those items after they were stolen by Bailey was admissible under Delaware Rule of Evidence 404(b) ("D.R.E. 404(b)"). According to the State's motion,

> Mr. Bailey's act of stealing Mr. Risper's illegal drugs and weapon set in motion a series of events that eventually lead [*sic*] to him being gunned down. This act served as the impetus for a home invasion of the Waples's residence and the murderous actions taken by Mr. Risper on May 11, 2018. These events and their illegal nature are so

9

intertwined that separation of them would result in an incomplete understanding of Mr. Bailey's death.[18]

The State argued that it would not be offering evidence of Risper's drug and weapon possession to show that he was a bad person or had a general criminal disposition. Rather, the State claimed that the evidence was relevant to Risper's motive and state of mind and the absence of mistake during Bailey's homicide, which are permitted purposes under D.R.E. 404(b)(2). The State contended that the evidence tended to show that "Bailey's murder was not accidental but was instead the result of a revenge killing."[19] The State recognized, however, that it would be appropriate for the court to instruct the jury that it should only consider the evidence for those purposes. Finally, in an addendum to its motion *in limine*, the State argued that, to the extent that its proposed presentation of the Rule 404(b) evidence relied on out-of-court statements, those statements were admissible under exceptions to the rule against hearsay—specifically, D.R.E. 804(b)(3)'s exception for statements against penal interest and D.R.E. 807's residual hearsay exception.

Risper countered with a panoply of objections, claiming, among other things, that the evidence was not relevant and, even if it were, its probative value was substantially outweighed by its prejudicial effect. But the objections most relevant to this appeal focused on what Risper contended was the inadmissible hearsay that

---

[18] App. to Opening Br. at A22.
[19] *Id.*

served as the foundation of the proffered evidence and the State's inability to prove Risper's prior crimes by plain, clear, and conclusive evidence as required under our holding in *Getz v. State*.[20]

In a lengthy bench ruling, the Superior Court held that the proffered evidence was relevant to the issues of the killer's identity, motive, intent, and the absence of mistake. The court then conducted a detailed *Getz* analysis before ruling that the evidence was admissible. The court noted that it would "of course, give a limiting instruction regarding the prior incidents and will do so, if requested by the defense, when the evidence comes in and when the jury instructions are read to the jury."[21] In the event, the defense did not request an instruction when the evidence was admitted and specifically requested that a "prior bad acts" *Getz* instruction proposed by the court not be given before jury deliberations.[22]

---

[20] 538 A.2d 726, 734 (Del. 1998) (holding that to be admissible, evidence of other crimes "must be proved by evidence which is 'plain, clear[,] and conclusive'" (quoting *Renzi v. State*, 320 A.2d 711, 712 (Del. 1974))).

[21] Opening Br. Ex. A at 13.

[22] The following exchange took place during the pre-deliberation prayer conference:
> Defense counsel: We do not request a Getz analysis. So we would like that removed.
> The Court: Well, Getz would be for you. I will hear from the State, but if you don't want it, it's really - - it is what it is . . . . I try to make it as innocuous as possible, but if you don't want it, it's for you, . . . it's not really for the State.
> Defense counsel: We want it out.
> Prosecutor: We have no objection.
> The Court: Take it out.

App. to Answering Br. at B491.

11

## B. The State's Belated Disclosures

### 1. "AE's" Statement

On April 1, 2019, seven and one-half months before Risper's trial, the police investigating Bailey's murder recorded an interview of an individual—identified in the record as "AE"[23]—who claimed that a friend confessed in detail to shooting Bailey and had even showed her the gun used in the shooting.[24] In certain respects, the confession lined up with Channell Gray's account of the murder; for instance, AE's friend told her "that he actually got out of a truck and killed Corey Bailey."[25] AE identified the friend as "Laval" or "Lavelle,"[26] but clarified that she was not referring to Laval Farmer, Risper's companion around the time Bailey was shot. AE's statement suggested that her informant told her that Bailey had stolen from other drug dealers and that people other than Risper wanted to kill Bailey.

Around the time the police recorded this interview, Risper's trial was scheduled to begin in June 2019. On May 23, 2019, defense counsel delivered a letter to the Court requesting a continuance of the trial:

---

[23] Near the end of the trial, the State identified AE during two sidebar conferences as "Ms. Evans." *Id.* at B391; B430.

[24] The details in AE's statement are sketchy. The record contains neither a transcript of the statement or the CD containing the recording of the interview. Thus, our understanding of the substance of AE's statement is derived exclusively from defense counsel's description of it to the court in connection with Risper's request for a dismissal and, alternatively, a continuance, and Detective Csapo's testimony on cross-examination.

[25] App. to Answering Br. at B42.

[26] *Id.*

12

Please accept this letter as Defendant's request for a continuance of the trial, which is currently scheduled to begin on Monday, June 10th, 2019. The reason for the request is on April 22nd, the State filed a Motion in Limine seeking to admit evidence of Defendant's prior bad acts to prove motive. Defense counsel is aware of information about people that sought to kill the victim. We, therefore, request additional time to explore and gather evidence as to others' motives to kill the victim and attempts to do so.[27]

The court granted Risper's request and rescheduled the trial for mid-November of 2019.

Despite the centrality of the State's motive evidence and defense counsel's expression of interest in identifying other individuals who possessed the motive the State ascribed to Risper, the State did not produce a copy of the AE interview to Risper's counsel. Instead, it held onto it until the afternoon of November 14, 2019—the day before Risper's trial was to begin. The State offered no justification for not producing the statement earlier other than it was an "error within [the Department of Justice's] office."[28]

On the day following the State's production of the AE interview, a jury was selected. That was on Friday, November 15. In an office conference on Monday morning, November 18, defense counsel alerted the court to the production of AE's statement and described its contents as outlined above. Defense counsel noted that

---

[27] May 23, 2019 letter from Tasha Marie Stevens, Esquire to The Honorable E. Scott Bradley, *State v. Risper*, 1805007714A (Del. Super. Ct.) (D.I. 57).
[28] App. to Answering Br. at B45.

her client had been incarcerated pending trial for the preceding 18 months and that the State's failure to produce the exculpatory statement prevented the defense from conducting a thorough investigation. Counsel argued that the State's withholding of the statement was a *Brady* violation and moved for dismissal.

The court denied Risper's motion on the spot, but offered an alternative remedy:

> Well, you can have their name [*sic*], but I think ultimately what I'm going to do is deny your motion and let you play this interview, even though it's all hearsay.
>
> I agree you should have had it sooner. You could have done some due diligence.
>
> . . . [Y]ou never know what you'll get when you go talk to people. Would it have been any better than this? I don't know. But you can play it and you can ask the detective about it . . . I think that's a reasonable remedy. It will all come in, even though it's hearsay.[29]

The court recessed and reconvened during the early afternoon. The first order of business, before opening statements, was reconsideration of the effect of the State's belated disclosure of AE's statement. Pointing to their professional obligation to fully investigate the ramifications of AE's statement—an investigation precluded by the timing of the State's disclosure—Risper's counsel now asked for a continuance of the trial. Throwing grace to the wind, the State opposed the request.

The court denied the continuance request, satisfied that its previously crafted

---

[29] *Id.*

14

remedy—admission of the recorded statement—was adequate and "might even be better than having a chance to go and talk to the witness."[30] For reasons that the record does not disclose, Risper did not offer the recorded statement in evidence during the trial. Risper's counsel did, however, cross-examine the detective who interviewed AE about the April 2019 interview. The detective acknowledged that AE had told him in a recorded interview that someone other than Risper had told her that "they were involved in the murder of Corey Bailey"[31] and had showed her where the "slide of the gun"[32] used in the murder was located. The detective further admitted that he did not look for the gun part, nor had he followed up by way of investigation or a police report on the information that AE had provided.

### 2. *Staci Weldon's and Channell Gray's Shoplifting Scheme*

An unusual twist developed at trial concerning the examination and testimony of Staci Weldon and Channell Gray. Weldon, it will be recalled, was Bailey's girlfriend and accomplice in the Camellia Drive burglary. And Gray was the only person who witnessed Bailey's murder by a masked man that she identified as Risper. During its cross-examination of Gray, the defense sought to impeach her credibility by highlighting inconsistencies in her testimony and exposing her prior conviction for theft—a crime of dishonesty.

---

[30] *Id*. at B47.
[31] *Id.* at B426–27.
[32] *Id.* at B427.

Weldon testified two days after Gray. Addressing her activities in the hours before the May 11 shooting, Weldon disclosed that, as an individual named Marty was driving her and Bailey around in Coverdale Crossroads, "a woman had stopped [her] and asked [her] if [she] could get her little boy some clothes from the store, and how much [she] would charge for them."[33] Weldon admitted that she would "get" the clothing by shoplifting. She had previously told Detective Csapo about this shoplifting plan and identified the woman who had solicited her to steal the clothing as Channell Gray. But in the version of the detective's report that the State provided to the defense during discovery, Gray's name had been redacted.

After Weldon's cross-examination, during which the defense did not press her to identify the woman who asked for her help, the State requested a sidebar conference at which is disclosed that

> as cross was going on, we were looking through the discovery that we sent to defense and noticed that there was a redaction that needs to be clarified for the defense prior to them redirect or crossing. We actually ended up redacting out the person she was shoplifting for . . . . [It was] Channell Gray.[34]

Because of this late disclosure, the defense was permitted to resume its cross-examination of Weldon. Although Weldon once again admitted that she intended to shoplift the clothing, she denied that the as-yet unidentified woman had asked her to

---

[33] *Id*. at B291.
[34] *Id.* at B298.

16

steal the clothing. And when asked to identify the woman, Weldon said that she did not remember the woman's name and went so far as to deny that she had identified the woman as Channell Gray. Shortly after that, Weldon's testimony concluded, and the court recessed for the day.

The following morning, citing the State's violation of its obligations under *Brady* and *Giglio v. United States*,[35] the defense moved "for either dismissal of the case or a mistrial."[36] The court ruled that neither a dismissal nor a mistrial was appropriate. After "agree[ing] that this information should have been turned over to the defense prior to trial,"[37] the court explained why it would not order the relief Risper requested:

> In my view, this is an error on the scale of the smaller side of things. I think at the end of the day the evidence will be in front of the jury that Channell Gray asked the lady to sell her some clothes, and that Channell Gray knew that the lady, who was Staci Weldon, was going to go steal those clothes and sell them to her.
>
> So that certainly touches on her honesty. She will not, unless the defense wants her brought in and wants to ask her about this, she will not be in a position to deny knowing that. I'd let that come in, even though there is really no foundation for how Staci Weldon might know that Channell Gray knew that Staci Weldon was going to steal the clothes. But that will come in. That's how it's going to be painted in front of a jury. You folks can use that, you can argue that, and that goes to her credibility.

---

[35] 405 U.S. 150 (1972).
[36] App. to Answering Br. at B309.
[37] *Id*. at B308.

I do agree with the State that this is, at best, you know, it's like many attacks on credibility. It's not about a material fact in the case, it's a tangential thing.[38]

## C. Miscellaneous Procedural Facts

At the outset of the trial, Risper's counsel chose not to make an opening statement to the jury. In its case-in-chief, the prosecution called 28 witnesses over the span of five days. After the State rested, the defense also rested without calling any witnesses. As previously mentioned, the jury found Risper guilty of murder in the first degree, conspiracy in the first degree, and possession of a firearm during the commission of a felony. And after the Superior Court sentenced him to life plus 30 years in prison, Risper appealed.

## D. Issues Raised on Appeal

Risper contends that the prosecution's claim that the marijuana and firearm Bailey stole during his burglary of the Camellia Street property belonged to Risper in effect attributed uncharged criminal conduct—unlawful drug possession—to him. As such, according to Risper, the evidence was subject to the limitations of D.R.E. 404(b) and, in particular, the requirement under that Rule as interpreted in *Getz v. State* that the evidence be "plain, clear[,] and conclusive."[39] Risper argues that the evidence that the pilfered weed belonged to Risper did not meet this standard and

---

[38] *Id.* at B309.
[39] *Getz*, 538 A.2d at 734.

18

was thus inadmissible under D.R.E. 404(b).  Risper then argues that, if the evidence of Risper's ownership of the marijuana is eliminated from consideration, the evidence of his participation in the Waples home invasion has no independent logical relevance to the shooting of Corey Bailey and is likewise inadmissible under D.R.E. 404(b).  Risper also argues that the Superior Court erred when it refused to dismiss the indictment or grant a continuance in response to the State's belated disclosure that someone other than Risper confessed to shooting Bailey and that two important prosecution witnesses were engaged in a shoplifting scheme at the time of the shooting.

## III.   STANDARD OF REVIEW

We will not set aside a trial court's admission of evidence under D.R.E. 404(b) unless the trial court has abused its discretion.[40]  We review questions of law and constitutional claims, such as claims based on the State's failure to disclose exculpatory or impeaching evidence, *de novo*.[41]     We review the Superior Court's denial of a continuance request for abuse of discretion.[42]

---

[40] *Pope v. State*, 632 A.2d 73, 78–79 (Del. 1993).
[41] *Wright v. State*, 91 A.3d 972, 982 (Del. 2014).
[42] *Cooke v. State*, 97 A.3d 513, 528 (Del. 2014).

19

# IV.   ANALYSIS

## A.   The Evidence of Risper's Possession of Marijuana and Firearm and Involvement in Home Invasion

Under D.R.E. 404(b),

> [e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

In *Getz*, this Court established six guidelines for the admission of uncharged misconduct evidence under D.R.E. 404(b):

> (1)   The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case.  If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.

> (2)  The evidence of other crimes must be introduced for the purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.

> (3)  The other crimes must be proved by evidence which is "plain, clear and conclusive." *Renzi v. State*, Del. Supr., 320 A.2d 711, 712 (1974).

> (4)  The other crimes must not be too remote in time from the charged offense.

> (5)   The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.

20

(6) Because such evidence is admitted for the limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105.[43]

Inherent in this formulation of the *Getz* guidelines is our recognition that "evidence of prior misconduct is admissible when it has 'independent logical relevance' and when its probative value is not substantially outweighed by the danger of unfair prejudice."[44]

Regarding his possession of marijuana, Risper's challenge relies exclusively on the third *Getz* factor. Because the evidence that the marijuana belonged to Risper consisted of statements that Risper contends were inadmissible hearsay, he claims that it is not "plain, clear, and conclusive" as required under *Getz*. Relying on our decision in *Chavis v. State*,[45] Risper argues that the hearsay constituted second-hand knowledge and therefore could not be used to establish that Risper possessed the marijuana. This reflects a basic misunderstanding of *Chavis*.

*Chavis* involved a burglary prosecution in which the State offered evidence, through a detective's testimony, of the defendant's prior convictions for crimes that bore a resemblance to the crime for which the defendant was being tried. The detective's testimony was based entirely on police reports of the prior incidents. On cross-examination, the detective acknowledged that he had no involvement in the

---

[43] *Getz*, 538 A.2d at 734 (footnote omitted).
[44] *Id.* at 730 (citing D.R.E. 403 and *Diaz v. State*, 508 A.2d 861, 865 (Del. 1986)).
[45] 235 A.3d 696 (Del. 2020).

21

prior investigations and that his only knowledge of them was derived from the police reports that he did not prepare. We determined that "[s]uch secondhand knowledge does not satisfy *Getz*'s requirement that proof of other crimes be by evidence which is 'plain, clear[,] and conclusive.'"[46]

Here, by contrast, the Superior Court relied on numerous statements that Bailey made to others—Yonta Clanton, Deavon Sheppard, O'Shea Waples, and, last but not least, Staci Weldon, his accomplice in the theft—that he had stolen from Risper. The court determined that these statements were admissible as self-inculpatory under D.R.E. 804(b)(3) and through D.R.E. 807's residual hearsay exception.[47] In *Chavis*, there was no suggestion that the police reports from which the detective testified were admissible evidence. Therefore, Risper's reliance on *Chavis* is unavailing.

Risper's D.R.E. 404(b) argument suffers from another fundamental flaw. If Risper's unlawful possession of the stolen marijuana and firearm was central to the evidence admitted under D.R.E. 404(b), he might have a point. But the State did not offer proof of Risper's drug possession for the purpose of showing that he had a motive to harm Bailey. Instead, it was Bailey's crimes—the burglary and theft—of

---

[46] *Id.* at 700 (quoting *Renzi*, 320 A.2d at 712).
[47] Other than a half-hearted complaint with the trial court's determination that the statements were reliable, Risper does not mount a meaningful challenge to the court's rulings on the applicability of these hearsay exceptions.

which Risper was the victim that, under the State's theory, gave rise to Risper's desire to exact revenge.  Seen from this angle, the illegality attributable to Risper is largely incidental.  Had Bailey stolen a television, as originally planned, or other valuable property, instead of marijuana and a firearm, the theft would be equally relevant to Risper's motive.[48]

To sum up, the State proved Risper's connection to the stolen marijuana through Bailey's admissions as recounted by numerous witnesses, including Bailey's accomplice.  The trial court did not abuse its discretion when it determined that such proof—especially when considered together with Risper's attempt to recover the stolen marijuana—was plain, clear, and conclusive.  Moreover, that the logical relevance of the evidence does not depend on the illegality of Risper's unlawful marijuana possession, but on the fact that Bailey stole the marijuana from him, persuades us that any prejudice Risper might have suffered because of the introduction of the evidence was marginal in relation to its probative value.

---

[48] We note that, in its Answering Brief, the State landed a glancing blow on this point when it observed that "the object of the theft was not significant to the State's theory of the case—the fact that Bailey stole the items from Risper was."  Answering Br. at 13.  And the State made no mention of the illegal nature of the stolen property in either its opening statement or in its closing argument. But we also note that, when the State presented its motion *in limine* to the Superior Court, it seemed to emphasize that the stolen property was contraband.  App. to Opening Br. at A23–24 ("There is a significant likelihood that a jury . . . would face a large conceptual void if they were not able to get a full understanding of Mr. Risper's actions in relation to the theft of *his drugs and weapon*. This is integral to understanding the death of Corey Bailey . . . . Understanding Mr. Risper's possession of *illegal drugs and [a] weapon* [] speaks directly to the motivations behind his intentional acts.") (emphasis added).

Finally, Risper's challenge to the admissibility of the evidence of the Waples home invasion hinges upon his argument that the court should have excluded the evidence of Bailey's theft of Risper's marijuana and firearm. "Without the underlying evidence of the theft," Risper argues, "the State's purported evidence of . . . the home invasion merely showed that Risper had a propensity to commit violent crimes and for carrying a weapon,"[49] which is impermissible under D.R.E. 404(b). Our conclusion that the Superior Court did not abuse its discretion when it admitted the evidence of the theft fatally undermines the premise of this argument. Accordingly, we hold that the Superior Court did not abuse its discretion when it admitted evidence of Risper's invasion of the Waples residence, ostensibly to take back the marijuana that Bailey had stolen from him.

### B.    The State's *Brady* Violations

In criminal proceedings, the prosecution has a constitutional obligation to disclose exculpatory and impeachment evidence within its possession to the defense when that evidence might be material to the outcome of the case. Because this obligation was first recognized by the United States Supreme Court in *Brady v. Maryland*,[50] it is usually referred to as the *Brady* rule.[51] The *Brady* rule is "based

---

[49] Opening Br. at 23.

[50] 373 U.S. 83; *see also Giglio*, 405 U.S. at 154 (holding that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule).

[51] *See* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.3(b) (4th ed. 2020).

24

on the requirement of due process"[52] and, as such, is grounded in principles of fairness—"not punishment of society for misdeeds of a prosecutor but an avoidance of an unfair trial of the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."[53]

As this Court observed in *Starling v. State*, "[t]here are three components of a *Brady* violation: (1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the state; and (3) its suppression prejudices the defendant."[54]

There can be little doubt that AE's statement was exculpatory and that the evidence regarding Weldon's and Gray's purported shoplifting scheme was at least potentially impeaching. Yet the State contends that "[t]o the extent [it] made an untimely disclosure of exculpatory or impeaching evidence, Risper received the information [in] sufficient time to effectively use it[,] and the Superior Court fashioned the appropriate remedy for the purported *Brady* violations."[55] Having dropped the recording of AE's interview on defense counsel on the eve of trial—seven and a half months after it was recorded—the State takes Risper to task for not

---

[52] *United States v. Bagley*, 473 U.S. 667, 675 (1985).
[53] *Brady*, 373 U.S. at 87.
[54] *Starling v. State*, 882 A.2d 747, 756 (Del. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281––82 (1999)).
[55] Answering Br. at 17.

"sending an investigator out to find AE"[56] as the trial progressed. The State argues further that allowing Risper to cross-examine Detective Csapo about his interview of AE was a sufficient substitute for AE's testimony. Thus, according to the State, "[t]he Superior Court did not err when it denied Risper's motion to dismiss based on the State's untimely production of AE's recorded statement."[57] And "because of the strength of the case against Risper,"[58] the late disclosure was not material—that is, a timely disclosure would not have "create[d] a reasonable probability of a different outcome."[59] We take up the State's contentions in turn, focusing first on the eve-of-trial disclosure of AE's statement.

### 1.    Timeliness

Waiting until the eve of trial before disclosing important exculpatory evidence is problematic in various respects. Although "it may well be that marginal *Brady* material need not always be disclosed prior to trial,"[60] it cannot be seriously argued that evidence that someone other than the defendant committed the crime is marginal evidence. And, to quote a relevant treatise, "where the prosecution has the statement of a witness who could present exculpatory testimony and does not intend itself to call the witness, disclosure before trial would be necessary to ensure that the defense

---

[56] *Id.*
[57] *Id.* at 21. The State does not address the Superior Court's denial of Risper's continuance request.
[58] *Id.*
[59] *Id.* (citing *Morris v. State*, 2019 WL 2123563, at *6–7 (Del. May 13, 2019)).
[60] *Grant v. Alldredge*, 498 F.2d 376, 383 (2d Cir. 1974).

has an opportunity to subpoena that witness for trial."[61]  "[A] prosecutor's timely disclosure with respect to this type of material cannot be overemphasized if due process is to be afforded a defendant at . . . trial."[62]

The State's implication that the defense had sufficient time to exploit the information provided by AE ignores the realities of criminal trial practice.  Besides impairing the defense's ability to subpoena AE, the State's late production effectively precluded any meaningful investigation of AE's disclosures, including the discovery of the identity of the person who confessed, the location of the gun, and the names of the other drug dealers who, according to AE's informant, had a motive to harm Bailey.[63]  Moreover, "[t]he opportunity for use under *Brady* . . . [includes] the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought."[64]  Here, the State's belated disclosure eliminated that opportunity.  We therefore reject the State's suggestion that the

---

[61] LaFave, *supra* note 51, § 24.3(b).

[62] *United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 739 (3d Cir. 1978) (Seitz, C.J., concurring) (involving disclosure of government's intercession on behalf of a prosecution witness in a pending state criminal prosecution).

[63] *See Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001) ("The limited *Brady* material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation.  When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired.  The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing.  And the defense may be unable to assimilate the information into its case.").

[64] *Id*. at 103.

timing of its disclosure of the AE interview did not impair Risper's ability to use that information effectively.

### 2. The Superior Court's Remedy

It will be recalled here that the defense initially moved to dismiss the indictment upon its discovery that the State's November 14, 2019 supplemental discovery response included a CD recording of the April 1, 2019 interview of AE.[65] The court, after acknowledging that the State should have produced the CD sooner, denied the motion but, as a "sanction for the State,"[66] ruled that the defense could "play [the CD before the jury] and . . . ask the detective about it."[67] After a recess but before opening statements, the defense requested a continuance of the trial so it could investigate the information consistent with their professional obligations to Risper. The State opposed, and the court denied, this continuance request. The State now contends that the allowance of otherwise inadmissible hearsay evidence of the contents of AE's statement was an adequate remedy for its belated disclosure. We disagree.

Neither the Superior Court when it denied Risper's motion to dismiss and, alternatively, his motion for a continuance nor the State when it opposed Risper's

---

[65] The AE CD was the seventh item listed in a cover letter enclosing 16 separate items including three CDs, seven DVDs, three supplemental police reports, and notes from trial preparation meetings with witnesses.

[66] App. to Opening Br. at A120.

[67] *Id*. at A117.

motions seem to have recognized the ramifications of the State's belated disclosure. Focusing solely on the admissibility of AE's statement, the court did not recognize the potential hole it left in Risper's defense. Just as in *Leka v. Portuondo*, the belatedly disclosed statement by AE "could have led to specific exculpatory information only if the defense undertook investigation."[68] But the State, by opposing Risper's continuance request, actively stepped in the way of any such investigation even though its mistake had created the problem. We understand why the court denied Risper's motion to dismiss; we cannot say the same for its denial of Risper's continuance request. That denial was, in our view, unfair to Risper and an abuse of discretion.

### 3. Materiality

Finally, we address the State's contention that the belatedly produced *Brady* material "did not involve possible testimony that was likely, if given, to create a reasonable probability of a different outcome."[69] The State's language addressed the third component of a *Brady* violation—the materiality prong.

In this Court's exhaustive discussion of *Brady* in *Wright v. State*, then-Justice Ridgely described the contours of *Brady's* materiality prong:

> Materiality does not require the defendant to show that the disclosure of the suppressed evidence would have resulted in an acquittal. Nor is a reviewing court required to order a new trial whenever a combing of

---

[68] *Leka*, 257 F.3d at 101.
[69] Answering Br. at 21 (quoting *Morris*, 2019 WL 2123563, at *6–7).

the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. Rather, the defendant must show that the State's evidence creates a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability of a different result occurs where the government's evidentiary suppression undermines confidence in the outcome of the trial.[70]

The United States Supreme Court's articulation of the materiality standard in *Kyle v. Whitley* is particularly apt in the context of this case: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial resulting in a verdict worthy of confidence."[71]

In our view, the evidence that an individual other than Risper confessed to AE that he had killed Bailey is, in the absence of any indication that the confession was unreliable, material. In reaching this conclusion, we reject the State's attempt to skirt the materiality inquiry set forth in *Wright* and to avoid the consequences of its error by invoking "the strength of the case against Risper."[72] Although such an argument might resonate in a case involving the suppression or untimely disclosure of marginally exculpatory evidence, it rings hollow where, as here, the evidence—

---

[70] *Wright v. State*, 91 A.3d 972, 988 (Del. 2014) (emphasis in original) (internal footnotes and quotations omitted).
[71] *Kyle v. Whitley*, 514 U.S. 419, 434 (1995).
[72] Answering Br. at 21.

an admission by someone else that he committed the crime of which the defendant stands charged—could undermine the very foundation of the prosecution's case.

Admittedly, the State's evidence supported the jury's finding of Risper's guilt beyond a reasonable doubt. We do not discount the compelling evidence of Risper's motive, the number of witnesses who testified that they saw Risper in a black Jeep in the vicinity of the shooting both before and after it took place, Channell Gray's testimony that she recognized the shooter as Risper, and Risper's DNA found on the black mask in the recovered Jeep. But none of this evidence was conclusive of Risper's guilt, and some of it was problematic for the prosecution.

For instance, Channell Gray admitted that she could see only a small portion of the shooter's face, which she described as "dark skinned"[73] when interviewed during the investigation; when she testified at trial, presumably having seen Risper in the courtroom, she "remember[ed] his face being light-skinned."[74] The inherent suspicion associated with finding a black ski-mask in a suspect's vehicle during the month of May is mitigated when, as happened here, the mask was found in a pile of other cold-weather clothing, suggesting that Risper used the mask for legitimate purposes. And as for Risper's motive, the opportunity to investigate the very

---

[73] App. to Answering Br. at B404.
[74] *Id.* at B60.

evidence that was belatedly produced might very well have produced additional evidence that others shared Risper's motive.

To be clear, this is not to say that the prosecution's case against Risper was a weak one; rather, it is only to say that we cannot conclude with confidence that its apparent strength would not have faltered in the face of in-court testimony from AE and the identification and, possibly, the in-court confrontation of the individual who confessed to her. Because that is so, we conclude that Risper did not receive a fair trial resulting in a verdict worthy of our confidence.

Finally, we agree with the Superior Court's conclusion that the State should have disclosed before Risper's trial began that the woman who asked Staci Weldon to provide clothing for her child was Channell Gray. But because we have found that the belated disclosure of AE's statement, standing alone, warrants a new trial, we need not subject this second belated disclosure to a full-fledged *Brady* analysis.

## V.    CONCLUSION

We reverse the judgment of the Superior Court and remand for a new trial consistent with this opinion.

32